Thomas A. DECKER, As Local Chairman for the U.T.U.; U.T.U., Local 377; and Robert W. Earley, General Chairman, U.T.U. General Committee of Adjustment C & T, B & O System, Plaintiffs,

v.

CSX TRANSPORTATION, INC., Defendant.

CSX TRANSPORTATION, INC., Plaintiff,

v.

UNITED TRANSPORTATION UNION ("UTU"); F.A. Hardin, President (UTU); J.A. Cianciotti, General Chairman, (UTU(E)); Robert Earley, General Chairman, B & O General Committee of Adjustment (UTU (C & T)); United Transportation Union Yardmasters Department ("RYA"); B.R. Carver, President (RYA); Richard P. Degenova, General Chairman (RYA); American Train Dispatchers Association ("ADTA"); R.J. Irvin, President (ATDA); D.W. Branham, General Chairman (ATDA); Brotherhood of Locomotive Engineers ("BLE"); L.D. McFather, President (BLE); J.A. LeClair, General Chairman ("BLE"); Brotherhood of Maintenance of Way Employees ("BMWE"); G.N. Zeh, President (BMWE); B.J. Twigg, General Chairman (BMWE); Transportation Communications Union ("TCU"); R.D. Kilroy, International President (TCU); R.F. Malcolm, General Chairman, C & O System Board of Adjustment, Brotherhood of Railway, Airline and Steamship Clerks ("BRAC"); L.H. Tackett, General Chairman, B & O System Board of Adjustment No. 6, BRAC; Transportation Communications Union, Carmen Division ("Carmen"); C.E. Wheeler, President, (Carmen); M.L. Crawford, General Chairman (Carmen); and International Association of Machinists and Aerospace Workers ("IAM"), Defendants.

Nos. CIV–87–1147C, CIV–87–1391C.

United States District Court,
W.D. New York.

May 26, 1988.

Akin, Gump, Strauss, Hauer & Feld (Ronald M. Johnson, of counsel), Washington, D.C., Moot & Sprague (Courtland LaVallee, of counsel), Buffalo, N.Y., for plaintiffs.

Highsaw & Mahoney, P.C. (John O'Brien Clarke, Jr., of counsel), Washington, D.C., Collins, Collins & DiNardo (John F. Collins, of counsel), Buffalo, N.Y., for defendants.

CURTIN, Chief Judge.

This case presents an important question, still unsettled by prior precedent, as to the interaction of two federal statutes: the Railway Labor Act, 45 U.S.C. §§ 151–188 [RLA], and the Interstate Commerce Act, 49 U.S.C. §§ 10101–11917 [ICA]. The issue arises in the context of the pending sale by CSX Transportation, Inc. [CSXT], plaintiff in this action for injunctive and declaratory

relief, of a line of railroad between Buffalo, New York, and Eidenau, Pennsylvania, to the Buffalo and Pittsburgh Railroad, Inc. [B & P], a newly formed corporation. Specifically, the question presented is whether a railroad has a duty to refrain from completing a sale of one of its rail lines pending bargaining under the RLA over the effects of that sale on the employees of that line when the Interstate Commerce Commission [ICC] has granted expedited approval to the proposed sale without imposition of labor protective conditions. In order to properly resolve this question, it will be helpful to the court to review the relevant statutory background, the factual and procedural background of the instant case, and the status of the relevant case law before addressing the specific areas of dispute between the parties.

*Statutory Background*

The RLA was enacted in 1926 to regulate labor relations on the nation's railroads by establishing an "elaborate machinery for negotiation, mediation, voluntary arbitration, and conciliation." *Detroit and Toledo Shore Line Railroad v. United Transportation Union,* 396 U.S. 142, 148–49, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). Central to the RLA's purposes is the duty imposed on rail labor and carriers by § 2 First,

> to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First; *see Chicago & N.W. Railway Co. v. United Transp. Union,* 402 U.S. 570, 574–75, 91 S.Ct. 1731, 1733–34, 29 L.Ed.2d 187 (1971). The disputes to which § 2 First refers fall into two categories—

"major" disputes, which involve efforts to formulate new collective bargaining agreements or proposals to change existing agreements, and "minor" disputes, which involve the interpretation or application of a specific provision of an existing collective bargaining agreement.[1]

Minor disputes are resolved through a formal grievance process that culminates in binding arbitration performed by the National Railroad Adjustment Board, as set forth in § 3, 45 U.S.C. § 153. When a minor dispute arises, the parties are not precluded from changing the status quo while arbitration is pending. *See, e.g., United Transp. Union v. Penn Central Transp. Co.,* 505 F.2d 542, 545 (3d Cir. 1974). However, strikes over minor disputes are prohibited, and may be enjoined by the district court to preserve the jurisdiction of the Adjustment Board. *Brotherhood of Railway Trainmen v. Chicago River & Indiana R.R. Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 *reh'g denied,* 353 U.S. 948, 77 S.Ct. 823, 1 L.Ed.2d 857 (1957). Major disputes, on the other hand, invoke a status quo obligation until the RLA bargaining processes have been exhausted. 45 U.S.C. §§ 152, 156; *see Detroit & Toledo Shore Line,* 396 U.S. at 150–53, 90 S.Ct. at 299–301.

Courts have the power to grant injunctive relief when a party violates the RLA procedures by unilaterally altering the status quo. *Detroit v. Toledo Shore Line,* 396 U.S. at 150, 90 S.Ct. at 299. Once the RLA processes are finally exhausted and it becomes clear that the parties will not reach an agreement, the status quo obligations are removed and the parties are free to resort to self-help. *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369 at 378–80, 89 S.Ct. 1109 at 1115–16, 22 L.Ed.2d 344 (1969).

The ICA was enacted in 1887 and has been substantively amended several times since.[2] It vests in the ICC exclusive juris-

---

1. It should be noted that the RLA does not use the terms "major" or "minor" to distinguish disputes. Rather, these terms have been judicially created by cases interpreting that Act. *See Elgin, J. & E Ry. v. Burley,* 325 U.S. 711, 722–28, 65 S.Ct. 1282, 1289–92, 89 L.Ed. 1886 (1945); *Local*

553, *Transport Workers Union v. Penn Central Transp. Co.,* 695 F.2d 668, 673 (2d Cir.1982).

2. The most important amendments for the purposes of the issues presented in the instant case are the Transportation Act of 1920, ch. 91, 41

diction to approve and regulate acquisitions of rail lines. *See, e.g.,* 49 U.S.C. §§ 10901(a), 11343(a); *see also Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 319–20, 101 S.Ct. 1124, 1131–32, 67 L.Ed.2d 258 (1981). Section 10901 governs the acquisition of rail lines by newly formed carriers and sets up a procedure whereby the new carrier may obtain prior approval of the transaction only upon a finding by the ICC "that the present or future public convenience and necessity require or permit" the transaction to proceed. 49 U.S.C. § 10901(a). The ICC has discretion to condition its approval on the provision of "a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected [by the transaction.]." § 10901(e). *Compare with* 49 U.S.C. § 11347 (regulating consolidations, mergers, or acquisitions involving existing rail carriers) ("Commission *shall* require" labor protective conditions) (emphasis added). Pursuant to § 10505, the ICC may exempt any § 10901 transaction from the prior approval requirements when it finds that such regulation "is not necessary to carry out" national rail transportation policy and is "not needed to protect shippers from the abuse of market power." 49 U.S.C. § 10505(a).

As a means of facilitating entry into the railroad business, the ICC, in a 1985 rulemaking proceeding, decided to exempt from regulation under § 10901 the entire class of transactions involving acquisitions by non-carriers. *See Ex Parte No. 392 (Sub. No. 1), Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. 10901,* 1 I.C.C.2d 810 (1985) [hereinafter *Ex Parte 392*], *review denied mem. sub nom. Illinois Commerce Comm'n v. ICC,* 817 F.2d 145 (D.C.Cir. 1987). Under *Ex Parte 392,* an exemption becomes effective, and a transaction

deemed approved, seven days after the acquiring entity files notice of exemption with the ICC, 49 C.F.R. § 1150.32(b); 1 I.C.C.2d at 820, unless a petition to revoke the exemption has been filed or the transaction is stayed by the Commission. *See* 49 U.S.C. § 10505(d); 49 C.F.R. § 1150.34; 1 I.C.C.2d at 815.

*Factual and Procedural Background*

The following facts are not disputed. CSXT is a Class 1 railroad subject to the jurisdiction of the ICC under the ICA, and is also a "carrier" within the meaning of the RLA. CSXT operates rail lines in 20 states and in the province of Ontario, Canada. As part of its system, CSXT owns and operates a 369–mile line of railroad between Buffalo, New York, and Eidenau, Pennsylvania. This line was formerly part of the Baltimore and Ohio Railroad [B & O] which, along with the Chesapeake and Ohio Railroad [C & O], was ultimately merged into CSXT as of 1987. CSXT presently administers all collective bargaining agreements between the former B & O and the unions representing employees on the Buffalo–Eidenau line. Item 31, pp. 1–2; Item 33, p. 2. (Item numbers refer to file No. CIV–87–1391C unless otherwise noted.)

Defendants are labor organizations and certain named officers of those organizations which represent various crafts or classes of CSXT employees, including those employees currently working on the Buffalo–Eidenau line. Defendants are representatives within the meaning of the RLA, 45 U.S.C. § 151, Sixth, and are all parties to collective bargaining agreements with CSXT. Item 33, p. 3.

CSXT asserts, and defendants do not dispute, that traffic on the Buffalo–Eidenau line has diminished to the point of marginality, and thus, in 1986, CSXT began looking for a buyer for that line.[3] Upon learn-

---

Stat. 456 (1920); the Transportation Act of 1940, ch. 722, 54 Stat. 898 (1940); the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31 (1976); and the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (1980). *See generally* H.R.Conf.Rep. No. 96–1430, *reprinted in* 1980 U.S.Code Cong. & Admin.News, 3978, 4110.

3. According to the testimony of John Gibson, Senior Manager of Short Line Marketing, CSXT, a "marginal" line is defined as one that is not currently earning the corporate rate of return, or is experiencing a traffic loss which, if uncorrected, would lead to eventual abandonment. Item 44, p. 58. The corporate rate of return fluctuates according to market trends (*id.*), and at the time the letter of intent was entered into

ing of the carrier's intention to sell, a number of defendant unions served notices on CSXT under § 6 of the RLA seeking to preserve the status quo until negotiations could be conducted regarding the effects of the proposed sale on railroad employees. CSXT responded that these notices violated the moratorium provisions of the respective collective bargaining agreements [4] and that, at any rate, the sale of the line was subject to the ICC's exclusive jurisdiction, and thus, the status quo requirements of the RLA were inapplicable. *Id.;* Item 31, pp. 2–3. Defendants have threatened to strike the entire former B & O system if the sale goes through. *See* Item 17, p. 19.

In August, 1987, defendants Robert Earley, General Chairman of defendant United Transportation Union [UTU], and Thomas Decker, Local Chairman of UTU Local 377, filed suit in New York State Supreme Court seeking to enjoin CSXT from altering the status quo as it existed on the Buffalo–Eidenau line as of the date the first § 6 notices were filed. The case was subsequently removed to this court and docketed as CIV-87-1147C. Meanwhile, on September 16, 1987, CSXT entered into a letter of intent with B & P to sell the line, and on September 22, 1987, B & P filed a verified notice of exemption with the ICC under 49 C.F.R. § 1150.31 and *Ex Parte 392* for exemption from the prior approval requirements of 49 U.S.C. § 10901. That exemption became effective seven days later on September 29, 1987, and by order dated October 13, 1987, and served October 19, 1987, the ICC denied the UTU's request for a stay of the exemption's effectiveness.

*Buffalo & Pittsburgh Railroad, Inc.—Exemption—Acquisition and Operation of Lines in New York and Pennsylvania,* Finance Docket No. 31116 (October 13, 1987); *see* Exh. 2 attached to Item 17. Also on September 22, 1987, B & P's corporate parents jointly filed a petition under § 10505 for exemption from the common control approval requirements of § 11343. By order dated December 21, 1987, and served December 28, 1987, the ICC granted the exemption, thereby authorizing B & P's parent corporations to control the B & P. *Genesee and Wyoming Industries, Inc., The Arthur T. Walker Estate Corp., Dumaines and Buffalo & Pittsburgh Railroad, Inc. Exemption—Continuance in Control,* Finance Docket No. 31117 (December 31, 1987); *see* Exh. 3 attached to Item 17.

By order dated November 3, 1987, this court found that, based on the Second Circuit's decision in *Railway Labor Executives' Ass'n v. Staten Island Railroad Corp.,* 792 F.2d 7 (2d Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed. 2d 978 (1987), the issuance of a status quo injunction as requested by the unions would impermissibly interfere with the ICC's order of exemption, and thus, the unions' complaint was dismissed for failure to state a claim upon which relief could be granted. *Decker v. CSX Transportation, Inc.,* 672 F.Supp. 674 (W.D.N.Y.1987).

On October 29, 1987, a few days before the dismissal of the unions' claim, CSXT initiated a separate action in this court against 12 labor unions and 27 union offi-

---

with B & P, the rate was 11.5 percent (*id.,* p. 59; Item 41, p. 3), while the rate of return on the Buffalo–Eidenau line was 1.4 percent (Item 41, p. 3). According to the unions, if a rail line's avoidable costs are greater than its revenues, *i.e.,* the line is unprofitable, the carrier will seek to abandon the line; if the rate of return is positive, but less than the desired corporate rate, the line cannot be abandoned since the railroad cannot obtain the necessary authority from the ICC. *See* Item 41, p. 3.

**4.** A typical moratorium provision reads as follows:

*Section 2—Effect of this agreement*

(a) The purpose of this Agreement is to fix the general level of compensation during the peri-

od of the Agreement, and to settle the disputes growing out of the notices served upon the carriers listed in Exhibit A by the organization signatory hereto dated on or about April 2, 1984, covering wages and rules, health and welfare and supplemental sickness benefits and proposals served on or about April 9, 1984, by the carriers for concurrent handling therewith....

(b) [N]o party to the Agreement shall serve, prior to April 1, 1988 (not to become effective before July 1, 1988), any notice or proposal for the purpose of changing the subject matter of the provisions of this Agreement....

*See* Exh. F(5) attached to Item 16.

cials [5] seeking a judgment declaring that CSXT is under no statutory obligation to negotiate with employees or their union representatives regarding the proposed sale of the Buffalo–Eidenau line and enjoining the unions from engaging in any strike activity in an effort to impede the sale. *See* Item 1. This action was docketed as CIV–87–1391C.

Prior to filing an answer to CSXT's complaint, the unions moved pursuant to Fed. R.Civ.P. 59(a)(2) to vacate this court's November 3, 1987, order in light of subsequent developments in the relevant case law, and moved pursuant to Fed.R.Civ.P. 42(a) to consolidate the two actions. The unions then answered CSXT's complaint (Item 7), asserting as affirmative defenses lack of subject matter jurisdiction over CSXT's request for an injunction against a strike, lack of standing for such an injunction, and failure to state a claim upon which relief may be granted. Item 7, p. 1. The unions also affirmatively asserted counterclaims for judgment against CSXT declaring that the status quo be maintained until the RLA dispute resolution processes have been fully exhausted, and enjoining CSXT from consummating the sale of the Buffalo–Eidenau line (or any of its rail lines) until the carrier has fully complied with the RLA. Item 7, p. 14.

The unions then moved to dismiss the complaint, insofar as it requests an injunction against a strike, on the ground that § 4 of the Norris–LaGuardia Act, 29 U.S.C. § 104 [NLGA], deprives the district court of jurisdiction to enjoin strike activity. Item 10. CSXT opposes, contending that the unions' threatened strike would be enjoinable as a violation of both the ICA and the RLA. Item 15.

Finally, the unions filed a motion pursuant to Fed.R.Civ.P. 65(a) for a preliminary injunction requesting that the court enjoin CSXT from altering the rates of pay, rules, and working conditions of its employees on the Buffalo–Eidenau line during the pendency of this action. Item 32.

On March 26, 1988, CSXT posted notices stating that the sale of the Buffalo–Eidenau line would be consummated at 12:01 a.m. on April 6, 1988, and that, effective 11:59 p.m. on April 5, 1988, certain jobs would be abolished. *See* Exh. A attached to Item 31. Under its sales agreement with CSXT, B & P has pledged to offer employment to at least 160 of the 226 employees currently working on that line, and as of April 13, 1988, had made job offers to

---

5. Named as defendants are:

United Transportation Union [UTU], F.A. Hardin (President, UTU), J.A. Cianciotti (General Chairman, UTU(E)), and R.W. Earley (General Chairman, B & O General Committee of Adjustment, UTU (C & T));

UTU, Yardmasters Department [RYA], B.R. Carver (Assistant to President, RYA), and Richard P. DeGenova (General Chairman, UTU(RYA));

American Train Dispatchers Association [ATDA], R.J. Irvin (President, ATDA), and D.W. Branham (General Chairman, ATDA);

Brotherhood of Maintenance of Way Employees [BMWE], G.N. Zeh (President, BMWE), and B.J. Twigg (Executive Board, BMWE);

Transportation Communications Union [TCU] (formerly Brotherhood of Railway, Airline and Steamship Clerks [BRAC]), R.I. Kilroy (International President, TCU), R.F. Malcolm (General Chairman, C & O System Board, BRAC), and L.H. Tackett (General Chairman, B & O System Board, BRAC);

Brotherhood of Locomotive Engineers [BLE], L.D. McFather (President, BLE), and J.A. LeClair (General Chairman, B & O Carmen);

TCU, Carmen Division [Carmen], C.E. Wheeler (President, Carmen), and M.L. Crawford (General Chairman, B & O Carmen);

International Association of Machinists and Aerospace Workers [IAM], J.F. Peterpaul (Vice President, IAM), A.J. Sarcone (General Chairman, IAM District 22), and W.D. Snell (Assistant President/Directing General Chairman, IAM District 22);

International Brotherhood of Firemen and Oilers [IBF & O], J.L. Walker (International President, IBF & O), and D.S. Anderson (General Chairman, System Council No. 6, IBF & O);

Sheetmetal Workers International Association [SMWIA], A.R. Hicks (General Chairman, SMWIA), and D.C. Buchanan (Dir. Railroad Workers, SMWIA);

International Brotherhood of Electrical Workers [IBEW], E.P. McEntee (International Vice President, IBEW), and George L. Laitile (General Chairman, IBEW), and

Brotherhood of Railroad Signalmen [BRS], V.M. Speakman, Jr. (President, IBEW), and C.T. Green (General Chairman, B & O System Committee, BRS).

*See* Item 1, p. 1.

184 CSXT employees.[6]

The sales agreement does not require B & P to assume the administration of the collective bargaining agreements currently in effect between CSXT and the defendant unions. B & P will be an independent carrier that will set its own freight rates, rates of pay, rules, and working conditions which will generally be different from the employment terms between the unions and CSXT. Item 44, pp. 85–87, 169; Item 42, pp. 7–11.

On April 5, 1988, after hearing oral argument of the parties' positions, this court ordered an evidentiary hearing on the injunction motions and cross motions and also ordered that the status quo on the Buffalo–Eidenau line be maintained until such time as that hearing was concluded and a decision on those motions was rendered. Item 40, pp. 109–12. The hearing was held between April 13–19, 1988, and both parties presented witnesses and exhibits to support their positions as to the various issues still in dispute.

The evidence presented at the hearing revealed several items of importance to these findings. For example, under existing collective bargaining agreements, many of the employees affected by the sale will be eligible for labor protections and furlough benefits. Item 41, p. 9. Union representation of rail labor is essentially categorized by craft—the Brotherhood of Locomotive Engineers [BLE], which represents engineers; the United Transportation Union (E) [UTU(E)], which represents firemen and hostlers; and the UTU (C & T), which

represents train service employees, are "operating craft" unions, while the rest of the unions named as defendants (*see* note 5, *supra*) are "non-operating craft" unions (or "non-ops"). Approximately 80 percent of the non-operating craft employees working on the Buffalo–Eidenau line, or about 80–85 employees, will be eligible for some form of labor protection as a result of the sale.[7] Item 46, pp. 93–94. All employees furloughed as a result of the sale are entitled to furlough benefits, including four months of medical insurance and one year of railroad unemployment insurance. Item 45, p. 22.

It was also established at the hearing that, while the work which CSXT employees are currently performing on the Buffalo–Eidenau line will remain in existence when the line is sold, current employees who enjoy contractual seniority rights to that work will not be able to exercise those rights once the line is sold, and the work transferred to the B & P. Item 42, p. 11; Item 47, pp. 12, 120–21.

Finally, it was established that, as mentioned above, some of the defendant unions are already party to protective agreements (such as the February 7, 1965 agreement). In the last round of national bargaining in 1984, several of the unions sought new protections or to expand existing ones, but agreed instead to adopt other economic gains. Item 45, p. 37; Item 46, pp. 42–46; Item 47, pp. 54, 146.

On May 10, 1988, prior to summations, the preliminary injunction applications

---

**6.** This figure (184) includes several CSXT employees on furlough status or working elsewhere in the CSXT system. As of the time of the hearing, according to the testimony of John Bell (Vice President and General Manager, B & P), 113 former CSXT employees (or exactly one-half the number of CSXT employees on the Buffalo–Eidenau line) had accepted B & P's offers. Item 44, p. 147; Item 44, p. 14.

**7.** For example, BMWE and BRS (the abbreviations used herein refer to the defendant unions, whose titles are set forth in full in note 5, *supra*) are party to the stabilization agreement of February 7, 1965, which protects employees in service on October 1, 1964, and guarantees 100 percent of their rate of pay of the job held at that time for the entirety of their working

lives. Item 46, p. 29. Seventeen of 38 employees represented by BMWE whose jobs will be abolished by the sale are eligible for protections under that agreement (*id.,* p. 30), and three of seven BRS-represented employees whose jobs will be abolished are eligible for such protections. *Id.,* p. 35. All TCU (B & O) employees are eligible for five-year protection at 100 percent of their daily rate (*id.,* p. 31), and TCU (C & O) employees are eligible for lifetime protections. *Id.* Carmen, IAM, IBEW (Communications), SMWIA, and IBFO-represented employees are eligible for protection under the September 25, 1964, agreement, which provides 60 percent furlough allowance for five years, based on a test period average. *Id.,* pp. 33–34; *see* Item 41, pp. 9–10.

were advanced to judgment for permanent injunction in accordance with Fed.R.Civ.P. 65(a)(2), as agreed to by the parties and as approved by the court.

*Current Status of the Relevant Case Law*

In its November 3, 1987 order (672 F.Supp. 674), this court relied on the *Staten Island* case, 792 F.2d 7, as the Second Circuit's most recent and most explicit ruling on the issue of whether the ICC's authority over a railroad's sale of a marginal line preempts the application of the RLA. The transaction in *Staten Island* involved an abandonment/sale in which the railroad initially abandoned the line at issue, and mandatory labor protective conditions were imposed by the ICC under § 10903(b)(2).[8] Subsequently, a buyer for the line was located, and the ICC authorized the sale under § 10905(e), which required dismissal of the application for abandonment and did not provide for labor protections.[9] The sale went through on the same day the ICC issued its authorization, and the labor unions filed suit in district court on the next day, claiming that the sale violated the status quo provisions of RLA § 6, and sought an injunction requiring the railroad to bargain with labor over the effects of the sale. The district court dismissed the complaint for lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1), reasoning that since exclusive jurisdiction over review of an ICC order rests with the federal courts of appeals under 28 U.S.C. §§ 2321 and 2342, the unions' claims constituted an impermissible collateral attack on the ICC's approval of the abandonment/sale, and must be dismissed. The Second Circuit affirmed, but modified the district court's dismissal of the unions' claims on the basis that the disagreement at issue was a "major" dispute within the ambit of § 6 procedures, and thus, the district court had jurisdiction over the claims. The dismissal was upheld, however, since the appeals court agreed with the district court's conclusion that no meaningful remedy could be fashioned that would not impinge upon the ICC's order approving the sale, and therefore, the claim should have been dismissed for failure to state a claim upon which relief may be granted, Fed.R.Civ.P. 12(b)(6). 792 F.2d at 11–12.

In adapting this reasoning to sales of rail lines to newly formed carriers under § 10901 and exempted from prior approval requirements under § 10505 and *Ex Parte 392*, every court deciding the issue (with one notable exception) has refused to order a status quo injunction under the RLA on the ground that such relief would impermissibly interfere with the ICC's authorization of the respective sale. *See, e.g., Railway Labor Executives' Ass'n v. Chicago & N.W. Transp. Co.*, 124 L.R.R.M. 2715 (D.Minn.1986), *appeal pending*, No. 87–

---

**8.** Section 10903(b)(2) provides that, once the application for abandonment is approved:

the Commission shall issue to the rail carrier a certificate describing the abandonment or discontinuance approved by the Commission. Each certificate shall also contain provisions to protect the interests of employees. The provisions shall be at least as beneficial to those interests as the provisions established under section 11347 of this title....

49 U.S.C. § 10903(b)(2).

Section 11347 provides that:

When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565).

Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees. The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action became effective, for that lesser period).

49 U.S.C. § 11347.

**9.** Section 10905(e) provides:

If the carrier and a person offering to purchase a line entered into an agreement which will provide continued rail service, the Commission shall approve the transaction and dismiss the application for abandonment or discontinuance....

49 U.S.C. § 10905(e).

5071–MN (8th Cir.); *Railway Labor Executives' Ass'n v. City of Galveston*, 685 F.Supp. 158 (S.D.Tex.1987); *UTU v. Burlington Northern R.R. Co.*, 672 F.Supp. 1579 (D.Mont. 1987); *Burlington Northern R.R. Co. v. UTU*, No. 86–5013–CV–SW–0 (W.D.Mo. Aug. 29, 1986), *appeal pending*, No. 86–2600–WM (8th Cir. argued Dec. 15, 1987); *Chicago & N.W. Transp. Co. v. Railway Labor Executives' Ass'n*, No. 88–C–444 (N.D.Ill., E.D. March 16, 1988), *appeal pending*, No. 88–1504 (7th Cir. argued April 21, 1988).

The notable exception to this line of reasoning is the Third Circuit's holding in *Railway Labor Executives' Ass'n v. Pittsburgh & Lake Erie Railroad Co.*, 845 F.2d 420 (3d Cir.1988) [*P & LE IV*], affirming the district court's decision in *RLEA v. P & LE*, No. 87–1745 (W.D.Pa. November 30, 1987) [*P & LE III*]. Because of the importance of that holding and its direct relevance to the issues presently before this court, a history of the *P & LE* decisions is in order.

The *P & LE* cases involved a sale to a newly formed carrier pursuant to § 10901. Upon notification that the sale was pending, the unions requested that the railroad bargain over the effects of the sale on its employees, and noted that the railroad had failed to send notice to the unions under § 6 of the RLA. The railroad refused to bargain, asserting that the transaction was controlled exclusively by the ICC and that § 6 bargaining would usurp the ICC's authority. The unions then commenced both a suit in federal court to enforce the employees' rights under the RLA and a strike against the railroad. The district court, upon the railroad's counterclaim, entered an order enjoining the strike on the ground that the jurisdiction of the ICC under the ICA in the regulation of such transactions displaced the anti-injunction provisions of the Norris-LaGuardia Act, 29 U.S.C. § 108 [NLGA]. *RLEA v. P & LE*, No. 87–1745, *slip op.* at 7 (W.D.Pa. October 8, 1987) [*P & LE I*].

The Third Circuit reversed in *RLEA v. P & LE*, 831 F.2d 1231 (3d Cir.1987) [*P & LE II*], finding that the mandate of the NLGA

divested the district courts of the power to enjoin employees from exercising their right to strike. In reaching her decision, Judge Sloviter undertook a reasoned analysis of the relationship between the NLGA, the RLA, and the ICA, and concluded that the regulatory policies of the ICA do not require the courts to treat that statute as labor legislation. Thus, according to *P & LE II*, the ICC's authority to approve acquisitions of railroad property does not supersede the strong national policy to resolve labor disputes as embodied in such laws as the NLGA and the RLA. 831 F.2d at 1235–36.

In reaching the merits of the unions' request for injunctive relief, the district court in *RLEA v. P & LE*, No. 87–1745 (W.D.Pa. November 30, 1987) [*P & LE III*], carried Judge Sloviter's reasoning a step further by holding that the authority granted to the ICC by § 10505 of the ICA is limited to exemption from the requirements of that act alone.

> The ICC has no express authority pursuant to § 10505 to exempt a transaction such as the instant one from the requirements of any other federal statute, e.g., the RLA. Thus, in effect, when the ICC exempts a transaction pursuant to § 10505, as is the case in *Ex Parte 392* proceedings, the ICC is doing nothing more than relieving the carrier of its obligation to comply with otherwise applicable requirements of the ICA.

*P & LE III*, No. 87–1745, *slip op.* at 8 (November 30, 1987). Thus, the fact that Congress delegated broad authority to the ICC to regulate the transportation industry did not require the court to imply that Congress at the same time intended to annul or implicitly overrule the RLA. *Id.* at 11. The court distinguished the *Staten Island* case on the ground that 1) the ICC had mandated completion of the sale in *Staten Island*, whereas the *P & LE* sale was merely permissive, and 2) the sale in *Staten Island* had already taken place by the time the unions filed for injunctive relief, and thus the status quo had already been altered, whereas the sale in *P & LE* had not yet occurred, and thus the court could preserve the status quo by way of

injunction. Accordingly, the court enjoined the railroad from altering the rates of pay, rules, and working conditions in existence at the time the unions served their § 6 notices until the dispute resolution provisions of the RLA were complied with.

In its affirmance, the Third Circuit significantly expanded upon the district court's analysis, *RLEA v. P & LE*, 845 F.2d 420 (3d Cir.1988) [*P & LE IV*]. The Court of Appeals had little difficulty in finding that the carrier's decision to sell its assets and the consequential elimination of a substantial number of jobs presented a "major" dispute which triggered the RLA bargaining process. *Id.* at 423, 428–430. The court had much more difficulty over the question of the preemptive effect of the ICA. While recognizing the ICC's exclusive authority over the approval and regulation of acquisitions of rail lines, *id.* at 434–438, the court found an equally strong policy in the RLA to avoid disruption of rail traffic which, coupled with the absence of language in the ICA that would expressly prohibit the issuance of a status quo injunction, persuaded the court to refuse to relieve the carrier of its RLA bargaining duties. *Id.* at 438–439.

Also persuasive to the Third Circuit was the fact that, of the 15 distinct policies enumerated in § 10101a upon which the ICC must focus in its regulation of the railroad industry, only one such policy directs the ICC's attention to the interests of labor. *See* 49 U.S.C. § 10101a(12). From this, the court refused to infer that Congress intended that rail labor look to the ICC as its sole source of protection when a pending sale threatened to affect a significant number of jobs. *P & LE IV*, at 443–444. Despite contrary trends in recent case law and public policy, and despite the unfortunate effect that a status quo injunction may have on the railroad's ultimate survival, the court found a clear statutory mandate to require bargaining under the RLA and affirmed the district court's order. *Id.* at 447, 449–450.

The court now moves on to address the specific areas of dispute between the parties. The first matter that must be discussed is the question as to whether the ICC's exemption of a sale, pursuant to § 10505 of the ICA and the ICC's rulemaking in *Ex Parte 392*, from the prior approval requirements of § 10901 operates to relieve the carrier of the negotiation obligations imposed on it by § 6 of the RLA.

*Preemption*

In *P & LE IV*, the Third Circuit, however reluctantly, held that the ICA did not preempt the field of labor protection in rail transportation transactions, and thus the sale of a railroad's assets, exempted by the ICC from the ICA's prior approval requirements, could not be consummated until the railroad had exhausted the bargaining requirements of the RLA. In the instant case, CSXT argues that *P & LE IV* was wrongly decided and conflicts with the Second Circuit's decision in *Staten Island* and this court's decision in *Decker. See* Item 39, pp. 5–6. The court agrees that the *P & LE IV* decision results in a conflict with the decision in *Decker;* the more difficult question is whether the *Staten Island* and *P & LE IV* cases are distinguishable and thus not directly in conflict.

The court in *P & LE IV* found *Staten Island* "clearly distinguishable" by virtue of the fact that the transaction in *Staten Island* was an abandonment/sale pursuant to § 10905, rather than a sale to a new carrier under § 10901. *See* notes 8 and 9, *supra*, and accompanying text.

> Section 10905 is a forced sale provision, requiring a financially ailing railroad to sell its assets to a financially responsible purchaser, as an alternative to abandonment of the line under § 10903. The ICC order in [*Staten Island*] therefore stated that the seller *"must* complete the sale/so long as the buyer consummates." 792 F.2d at 11 (emphasis added). The court therefore held that an injunction against sale could not be granted "without re[s]cission or modification of the ICC's order" mandating the consummation of the sale; such an attack, of course, would only be appropriate on direct appeal from the ICC order. *Id.* at 12.

*P & LE IV*, 845 F.2d 420 at 438, n. 27. The court found that the mandatory nature of the ICC's order distinguished that case from one involving a permissive order under § 10901, and thus refused to find that a status quo injunction pending RLA bargaining was an impermissible collateral attack on an ICC order authorizing the sale. *Id.*

Upon reconsideration, *see* Fed.R.Civ.P. 59(a)(2); *Brown v. Wright*, 588 F.2d 708, 710 (9th Cir.1978), it appears as though the Third Circuit's reasoning with regard to the *Staten Island* case is equally applicable in the instant case. The sale of the Buffalo–Eidenau line was authorized under the "permissive" provisions of the ICA, *i.e.*, §§ 10901 and 10505, and exempted pursuant to *Ex Parte 392*, and thus,

> the ICC has made no finding that the public interest *requires* this transaction, that the transaction *must* proceed, or that a delay in (or even collapse of) the transaction would *harm* the public interest. Therefore, [a status quo injunction would] not conflict with the public interest as determined by the ICC's order, because the injunction [would] merely [grant] a *delay* in the transaction, and the possibility that labor might win some protection for itself at the bargaining table.

*P & LE IV*, 845 F.2d at 439 (emphasis in original). The fact that the court in *Staten Island* specifically referred to the mandatory language in the ICC's order is of significance, since the court read that order to "require" the carrier to go through with the sale if the buyer was willing. 792 F.2d at 12. Such a reading of an individual abandonment/sale order should not be interpreted as a mandate that every ICC order involving a sale of a rail line, under all authorization provisions of the ICA, be implemented regardless of the parties' RLA bargaining obligations, especially where (as in the instant case) the order merely exempts a new carrier from ICA requirements without making a finding that the public convenience or necessity requires, or even permits, the transaction. *See* 49 U.S.C. § 10901(a).

As a further distinguishing factor, the instant case presents a significantly different factual situation from that faced by the court in *Staten Island* in that the sale by CSXT to B & P of the Buffalo–Eidenau line has not yet been consummated, whereas the sale of the Staten Island Railroad had already gone through by the time the unions sought relief in federal court. In other words, Staten Island Railroad "won the race to the courthouse" (*see* Item 40, p. 92), and the status quo had already been altered, thus leaving nothing for the court to preserve by way of injunction without unraveling the negotiated, fully consummated sale. Here, the status quo remains intact, and its preservation at this juncture would not "unravel" or otherwise interfere with the sale other than to delay consummation until such time as the parties can negotiate about the exact effects that the sale will have on the employees working on the Buffalo–Eidenau line. This court could, if appropriate, grant the unions' request for injunctive relief "without re[s]cission or modification of the ICC's order." 792 F.2d at 12.

As a more general matter, this court agrees with the Third Circuit's reasoned analysis of the interplay between the ICA and the RLA, and agrees with that court's finding that the ICC's jurisdiction over the authorization of proposed rail transactions does not preempt any potentially inconsistent bargaining duties under the RLA. *See P & LE IV*, 845 F.2d at 446. Reading the two statutes "in harmony, avoiding unnecessary conflict," *id.* at 440; *see generally Watt v. Alaska*, 451 U.S. 259, 266–67, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981), the Third Circuit found that, while significant tension does exist between the different means used by the ICA and the RLA to achieve a similar statutory purpose, *i.e.*, the promotion and protection of interstate rail transport, Congress intended these statutes to coexist. *P & LE IV*, 845 F.2d at 442, 445. The primary policy goal of the RLA is labor peace, which necessarily means concessions by management, whereas the interests of labor are of relatively small significance in the overall policy scheme of the ICA, and thus, Congress

could not have intended that rail labor look to the ICC as its sole source of protection. *Id.* at 443–444, 446. Absent some clearer expression of any such congressional intent, the court refused to ignore the RLA's mandate that the carrier bargain with its unions prior to completion of the sale. *Id.* at 448.

Accordingly, since today's findings are in conflict with this court's prior dismissal of the unions' claims in *Decker,* 672 F.Supp. 674, that dismissal is hereby vacated pursuant to Fed.R.Civ.P. 59(a)(2), and the action (CIV–87–1147C) is consolidated with the instant action under the docket number CIV–87–1391, pursuant to Fed.R.Civ.P. 42(a).

*Major/Minor Dispute*

■ Once it has been determined that the dispute resolution processes of the RLA are not preempted in this case by the ICC's authorization of the Buffalo–Eidenau line sale, it becomes necessary to determine whether the dispute between CSXT and the unions is "major," and thus subject to the RLA's bargaining process before the sale can be consummated, or "minor," and thus subject to the RLA's formal grievance process while the sale goes through. CSXT contends that the dispute is a minor one, since the sale of the line is based on the reduction-in-force [RIF] and job abolishment provisions in the collective bargaining agreements, the absence of any restrictions on such a sale in those agreements, and on the carrier's established past practice of selling or abandoning rail lines without engaging in RLA bargaining over each such instance.[10] According to CSXT, these bases for its right to sell the line relate to the interpretation or application of existing agreements with the unions, and the dispute is therefore a minor one under the RLA and the interpretive case law.

The unions, on the other hand, contend that the dispute involves the elimination, as a result of the sale, of the seniority rights and job security which the employees on the Buffalo–Eidenau line have accrued, which result clearly alters the rights and working conditions of those employees and thus presents a major dispute. Defendants allegedly do not challenge the carrier's rights under the existing agreements to abolish jobs and reduce the work force; defendants do, however, challenge the carrier's reliance on its past practice of selling rail lines without prior bargaining as relevant support for the carrier's interpretation of its contractual rights.

Under the Supreme Court's formulation in *Elgin, Joliet & Eastern Ry. Co. v. Burley,* 325 U.S. 711, 723–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945), a major dispute involves the formation or alteration of agreements, and thus deals with the prospective acquisition of contractual rights, while a minor dispute, in contrast, involves the application of the terms of an existing agreement, and thus deals with contractual rights previously accrued. 325 U.S. at 723, 65 S.Ct. at 1289; *see Local 553, Transport Workers v. Eastern Air Lines,* 695 F.2d 668, 673 (2d Cir.1982).

Major disputes:

arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

[A minor dispute], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.

10. CSXT also contends that the Section 6 notices served by several of the defendants demanding that the carrier bargain over the sale were barred by the moratorium provisions in the agreements, and that the carrier's interpretation of those provisions presents a minor dispute. While this contention has merit, it is also moot, since the moratorium on bargaining about previously negotiated matters expired on April 1, 1988, and the unions have served new Section 6 notices subsequent to that date. *See* Defendants' Exh. N.

*Elgin, J. & E.R. Co. v. Burley*, 325 U.S. at 723, 65 S.Ct. at 1290.

In the instant case, as in many cases under the RLA, the difference between viewing the dispute as an attempted acquisition of future rights on the one hand or as an assertion of vested rights on the other is a matter of degree. The dispute between CSXT and its employees, in very basic terms, comes down to whether the carrier has the unilateral right to sell one of its less profitable line operations, and thereby abolish all CSXT positions on that line, without bargaining with the unions about protections for its employees who will be affected by that sale.

It is a major dispute if the present agreements between the railroad and the brotherhoods contain express provisions contrary to the position taken by the railroads or if the clear implication of these agreements is inconsistent with the railroad's proposals. It is a minor dispute if there is a clearly governing provision in the present agreements, although its precise requirements are ambiguous; and it is also minor if what the railroad seeks to do is supported by customary and ordinary interpretations of the language of the agreements.

*Rutland Railway Corp. v. Brotherhood of Locomotive Engineers*, 307 F.2d 21, 33–34 (2d Cir.1962), *cert. denied*, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963). Thus, in attempting to resolve the "major/minor" dilemma, courts have looked to the collective bargaining agreements in effect between the parties to determine whether a "plausible interpretation" of those agreements would justify the carrier's action. *Local 553*, 695 F.2d at 673. The dispute has been found to be major if the court's examination of the agreements shows that "the carrier's contractual justification for its actions is 'obviously insubstantial.'" *Id.; see UTU v. Penn Central Transp. Co.*, 505 F.2d 542, 544 and n. 5 (3d Cir.1974) (*per curiam*); *see also Airline Stewards & Stewardesses Ass'n, Local 550 v. Caribbean Atlantic Airlines, Inc.*, 412 F.2d 289, 291 (1st Cir.1969). The dispute is minor if the agreement is "reasonably susceptible" to the carrier's interpretation. *Local 553*,

695 F.2d at 673; *see So. Pac. Transp. Co. v. UTU*, 491 F.2d 830, 833 (9th Cir.), *cert. denied*, 416 U.S. 985, 94 S.Ct. 2389, 40 L.Ed.2d 762 (1974); *UTU v. Burlington No., Inc.*, 458 F.2d 354, 357 (8th Cir.1972). The district court's task in this regard is not to interpret the agreements; it is to determine whether the carrier's claimed contractual defense is frivolous or "so obviously insubstantial as to warrant the inference that it is raised with intent to circumvent the procedures prescribed by § 6 for alteration of existing agreements." *So. Ry. Co. v. Bro. of Loc. Fire & Eng.*, 384 F.2d 323, 327 (D.D.Cir.1967); *see Airline Stewards*, 412 F.2d at 290. Further, the degree of scrutiny by the court is "clearly light, since ultimate resolution of the dispute is for the arbitrator." *Maine Central R.R. Co. v. UTU*, 787 F.2d 780, 783 (1st Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986).

In the instant case, CSXT claims that it has the contractual right to sell the B & E line without prior bargaining, as embodied in the RIF clauses in the existing collective bargaining agreements. A typical RIF clause provides, in relevant part:

> (a) When it becomes necessary to reduce expenses, the forces at any point or in any department or subdivision thereof shall be reduced, seniority to govern; and employees affected to take the rate of the job to which they are assigned.
>
> (b)(1) Five working days' advance notice will be given to employees affected before the abolishment of positions or reduction in force, and list of employees affected will be furnished to the local committee....

Plaintiffs' Exhibit 22.

The unions argue that they have never challenged the carrier's right, as embodied in these provisions, to abolish jobs or to reduce the work force when necessary. Defendants contend that such provisions do not specifically deal with line sales of the type pending between CSXT and B & P, and thus do not adequately provide for the protection of the employees' seniority rights which, according to defendants, will be rendered meaningless by the sale. De-

fendants therefore claim that what they have sought to do by serving § 6 notices is to supplement the existing rights of affected employees by obtaining new rights in an attempt to ameliorate the contemplated effects of the sale.

In light of the prior cases deciding the major/minor issue, it is apparent that this court is limited in the instant inquiry to determining whether CSXT's contractual defense of its right to sell is "frivolous" or "obviously insubstantial." Once it has examined the RIF provisions in the existing agreements and the past practices of the parties in prior line sales to determine whether a reasonable interpretation of those provisions and practices would justify CSXT's action, this court's inquiry must end. "[I]t is not for it to weigh, and decide who has the better of the argument. If the court did this, it overstepped its bounds and usurped the arbitrator's function." *Maine Central*, 787 F.2d at 782.

With regard to the RIF clauses, it is clear that these provisions at least arguably support CSXT's contention that it has the right to sell the Buffalo–Eidenau line. Given the degree of scrutiny which the court is constrained to employ, that contention cannot be considered "frivolous" or "obviously insubstantial," even in light of the unions' concession that such an inherent management prerogative indeed exists. Also persuasive is the carrier's contention that its right to sell without bargaining is supported by its prior sale of ten different line segments without objection by the unions that these sales violated the agreements or the RLA.[11] In defense of its proposed operational changes, a carrier is not limited to the collective bargaining agreements to demonstrate a contractual basis for its action, but may rely on "those actual, objective working conditions out of which the dispute arose, and clearly those conditions need not be covered in an existing agreement." *Detroit & Toledo Shore Line*, 396 U.S. at 153, 90 S.Ct. at 301; *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.*, 788 F.2d 794, 799 (1st Cir.1986), *cert. denied*, 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986). In order for past practices to be considered "actual, objective working conditions," they must have occurred "for a sufficient period of time with the knowledge and acquiescence of the employees...." *Detroit Toledo Shore Line*, 396 U.S. at 154, 90 S.Ct. at 301; *Boston & Maine*, 788 F.2d at 799. In the instant case, CSXT points to its sale of line segments on ten prior occasions since 1972 and, more specifically, to the sale of other segments of former B & O lines to the Knox & Kane Railroad in 1982, and to the Rochester & Southern Railroad Company in 1986. *See* note 11, *supra*. In both the Knox & Kane and Rochester & Southern sales, the purchasers were, previous to the sale, non-carriers, and both sales involved job abolishments and employee furloughs. The unions maintain that they did not acquiesce in these prior sales, but instead petitioned (unsuccessfully) the ICC to impose protective conditions, and at least one union (the UTU) served a § 6 notice in connection with the Rochester & Southern sale (that notice was later withdrawn when CSXT took the position, as it originally did with respect to the instant sale, that the notice was barred by the moratorium in its agreement with UTU and by the ICC's exclusive jurisdiction over the sale). The unions also argue that the ICC's practice of not imposing labor protections in such sales to newly formed carriers is of recent origin, commencing in 1982 with the Knox & Kane sale, and has provided the railroads an effective way to dispose of marginally

11. *See* Plaintiffs' Exh. 5. Those sales include:

| LINE SEGMENT | DATE OF SALE |
| --- | --- |
| Greenspring, WV—Petersburg, WV | 10–15–78 |
| Flora, IL—Shawneetown, IL | 10–01–79 |
| Knox, PA—Mt. Jewett, PA | 01–15–82 |
| Landenburg Jct.—Hockessin, De | 08–13–82 |
| Flora, IL—Sangamon Jct., PA | 03–31–83 |
| Carton, OH—Frankfort, OH | 03–31–85 |
| Charleston, WV—Clendenin, WV | 05–30–85 |
| Haywood—Spelter, WV | 03–31–86 |
| Ashford, NY—Rochester, NY | 07–20–86 |
| Firebrick, OH—RA Junction, OH | 03–31–87 |

profitable lines without the costs of employee protections which would be mandatorily imposed in an abandonment situation. Thus, according to the unions, there was no acquiescence in CSXT's past practice of selling lines or, alternatively, any such acceptance of past practice occurred because, prior to 1982, sufficient job protections were in place.

As the First Circuit pointed out in *Maine Central,* the court's role in this type of situation is limited to determining whether the carrier's position is arguable, and when the court endeavors to weigh a party's reasons for not protesting an instance of past practice, "it has looked too hard." *Maine Central,* 787 F.2d at 783. It is therefore evident to this court that CSXT's position with regard to its contractual right to sell the Buffalo–Eidenau line, supported by instances of past practice that were, arguably, accepted by the unions, is not so obviously insubstantial as to be an attempt to circumvent § 6 of the RLA. *See generally Chicago & North Western Transportation Co. v. RLEA,* No. 88–C–44 (N.D.Ill., E.D., March 16, 1988).

In *P & LE IV,* the Third Circuit found the dispute between the carrier and the unions to be major on the basis that the proposed action by PL & E would clearly result in a change in the nature of the collective bargaining agreements in force between the parties. That holding is not binding on this court for several reasons. First, in making its findings, the Third Circuit explained the essence of the P & LE's argument as being one of managerial prerogative rather than contractual justification, and noted that if the crux of the dispute had been about whether the collective bargaining agreement itself permitted or prohibited the sale, the dispute would have been a minor one to be resolved by arbitration. *P & LE IV,* 845 F.2d at 428, n. 9. Here, the essence of CSXT's argument is that the agreements justify its proposed action, and thus the dispute is at least arguably minor. Second, there is no indication in *P & LE IV* whether and to what extent the collective bargaining agreements in effect between P & LE and the unions provided protections for the employees of that line in the event of a sale. In the instant case, the court heard extensive testimony and was presented with voluminous exhibits which provided evidence of the protections in place under the existing agreements, protections which were, during the normal course of collective bargaining, accepted by the non-operating crafts in lieu of other benefits and rejected by the operating crafts in favor of such benefits. A third distinguishing factor is that, as a result of the sale by P & LE to the new carrier, approximately 500 of 750 P & LE employees would have lost their jobs and would have been placed on furlough status. In the instant case, CSXT will remain in the rail business after the sale of a relatively small portion of its total rail system, and a relatively small number of employees will be furloughed, since the B & P is required by the sales agreement to hire at least 160 former CSXT employees. *See* Exhibit 48; *see also* note 6, *supra,* and accompanying text. Finally, P & LE did not rely, nor could it have relied, on its past practice of selling its assets and going out of business, whereas in the instant case, CSXT's reliance on its past practice of selling line segments without prior bargaining supports its position that it has the contractual right to do so in this instance.

For all of the above reasons, the court finds that a plausible interpretation of the collective bargaining agreements in effect between CSXT and the defendant unions would provide a substantial contractual justification for the sale of the Buffalo–Eidenau line without additional bargaining. The dispute between CSXT and the unions is therefore minor, and subject to binding arbitration before the National Railroad Adjustment Board, pursuant to § 3 of the RLA, 45 U.S.C. § 153. Upon meeting with the parties, the court will frame and issue an appropriate order.

So ordered.