787 F.2d 780
 122 L.R.R.M. (BNA) 2017, 104 Lab.Cas. P 11,862
 MAINE CENTRAL RAILROAD COMPANY, Portland Terminal Company,
and Guilford Transportation Industries, Inc., Appellants,
v.
UNITED TRANSPORTATION UNION and Brotherhood of Maintenance
of Way Employees, et al., Appellees.
 No. 86-1037.
 United States Court of Appeals,
First Circuit.
 Argued Feb. 5, 1986.
Decided April 9, 1986.
Rehearing and Rehearing En Banc Denied May 22, 1986.
 
 Stephen M. Olson, with whom David J. Strasser, James E. Howard and Kirkpatrick & Lockhart, Pittsburgh, Pa., were on brief, for appellants.
 Clinton J. Miller, III, Washington, D.C., for United Transp. Union.
 Louis P. Malone, III, General Counsel, Washington, D.C., with whom Craig J. Rancourt, Biddeford, Me., was on brief, for Broth. of Maintenance of Way Employees.
 Before COFFIN and ALDRICH, Circuit Judges, and PETTINE,* Senior District Judge.
 BAILEY ALDRICH, Senior Circuit Judge.
 
 
 1
 This case originally came before us on a motion for stay pending appeal of a permanent injunction against Maine Central Railroad (MEC), Portland Terminal Company, and Guilford Transportation Industries. After argument, on our being informed that the record was complete, and seeing no purpose served by giving the parties a second bite at the apple, we continued our interim stay and ordered final briefing preparatory to full disposition. The parties having supplemented their initial briefs, we turn to the appeal on the merits.
 
 
 2
 Briefly, the facts are these. MEC has a customer at Rumford, Maine, Boise Cascade Corporation (Boise), engaged in manufacturing paper, requiring heavy traffic. Much of this is handled by MEC, which owns track and conducts switching operations at the Rumford Mill. MEC employed United Transportation Union (UTU) and Brotherhood of Maintenance Way Employees (BMWE) to perform these operations. On October 1, 1985, apparently because of Boise's expressed dissatisfaction with MEC's switching, MEC leased the Rumford Yard trackage to Boise, with an option to Boise to conduct the switching and maintenance operations with its own employees. Boise notified MEC of its intention to exercise the option commencing November 13, 1985. The unions, objecting to the loss of employment, threatened to strike. MEC brought suit in the district court seeking a temporary restraining order and, ultimately, an injunction. The court issued the former on November 12, 1985, which, by agreement, was continued without day. All MEC employees at the Rumford Yard were replaced by Boise employees, and were shifted to other, but perhaps poorer, positions. After the ripples of seniority bumping smoothed out, nine other UTU trainmen--no BMWE members--were displaced.
 
 
 3
 Hearings on a permanent injunction were held before a second judge on January 9 and 14, 1986. An injunction resulted, but the other way around, in favor of the unions, with MEC
 
 
 4
 enjoined from violating the status quo provisions of the Railway Labor Act (45 U.S.C. Sec. 152, First, Seventh and Sec. 156, [sic] by permitting or continuing to permit switching operations and maintenance of its Rumford Yard to be performed by persons other than those represented by [UTU] and [BMWE]; and it is
 
 
 5
 FURTHER ORDERED that MEC and Portland Terminal Company forthwith return the relationship between the parties in respect to the manning of the Rumford Yard to the status quo as of November 12, 1985....
 
 
 6
 This order was stayed pending appeal; consequently Boise employees are presently servicing the yard.
 
 
 7
 The question here, as below, turns on the nature of the dispute. A "minor" dispute, viz., one over interpretation and application of the union contract, is to be negotiated by the parties, and, failing resolution, submitted to the National Railroad Adjustment Board for binding arbitration. 45 U.S.C. Sec. 153, First; see Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 727, 65 S.Ct. 1282, 1292, 89 L.Ed. 1886 (1945). In the meantime, the railroad is free to apply its interpretation, and may, notwithstanding the Norris-LaGuardia Act, obtain an injunction against striking. Brotherhood of Railroad Trainmen v. Chicago River & Indiana R.R., 353 U.S. 30, 40-42, 77 S.Ct. 635, 640-41, 1 L.Ed.2d 622 (1957). A so-called "major" dispute, viz., one involving not an existing agreement, but "the acquisition of rights for the future," Elgin, ante, 325 U.S. at 723, 65 S.Ct. at 1290, is first negotiated, and, if negotiation fails, is sent to mediation under the National Mediation Board, 45 U.S.C. Sec. 156. Failing resolution here, there are various other forms of noncompulsory adjustment. Elgin, ante, 325 U.S. at 725, 65 S.Ct. at 1290-91. Either party, requesting such processing of a "major" dispute by proper notice under 45 U.S.C. Sec. 152, Sixth, is entitled to a "status quo" injunction. Detroit & Toledo Shore Line R.R. v. United Transp. Union, 396 U.S. 142, 155, 90 S.Ct. 294, 302, 24 L.Ed.2d 325 (1969). Thus, as evidenced by the two orders issued below, depending on the characterization of the dispute, one party or the other will be entitled to a favorable injunction.
 
 
 8
 UTU and BMWE argued successfully before the second judge, hereinafter the court, that MEC's abolition of all positions at Rumford was an attempt to acquire a set of totally new "rights for the future," which must be processed as a major dispute before it can be effected. See Carbone v. Meserve, 645 F.2d 96, 98 (1st Cir.1981), cert. denied, 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156. The court found, and appellants do not dispute, that "[T]he contract language ... does not apply ..., either to expressly or by reasonable implication, authorize or prohibit [the lease arrangement and resulting job abolishment]." We do not rest our decision on MEC's initial contention that, because the contract was silent, its action was a management decision. Rather, we turn to the alternative, that past practices and working conditions may become part of the collective bargaining agreement notwithstanding silence in the agreement itself. See Detroit & Toledo Shore Line, ante, 396 U.S. at 154-44, 90 S.Ct. at 301-02.
 
 
 9
 Appellants point to three previous, accepted actions, which they claim support the present one. The court disagreed: "None of the three instances ... is sufficiently parallel to the Boise Cascade lease arrangement and the job abolishment to establish that the type of transaction ... has been previously treated by either of the parties as governed by the existing contract arrangement...." In so finding, the court accepted appellees' argument that each of these instances was distinguishable from the one at issue. We read this resolution, however, as exceeding its authority.
 
 
 10
 Ours and, we believe, the majority view, is that the court's role is limited to determining whether MEC's assertion is "even 'arguable.' " Carbone, ante, 645 F.2d at 99. If MEC presented instances of past practice accepted by the unions which, arguably, could support its contention, the court's inquiry must end; it is not for it to weigh, and decide who has the better of the argument. If the court did this, it overstepped its bounds and usurped the arbitrator's function. See id., 645 F.2d at 100; Airline Stewards & Stewardesses Ass'n. v. Caribbean Atlantic Airlines, 412 F.2d 289, 291 (1st Cir.1969). We find that, in fact, this is what it did.
 
 
 11
 In each of the three instances relied on by appellants MEC leased track to another party, who then assumed all operations. The direct result, as here, was the abolition, or reduction, of all MEC jobs on the track. Appellees, and the court below, would distinguish these instances as follows: the first, a lease of track to Carter Milling, because it represented a recapture of work within the fence, well established in the industry, and because the job consequences on union employees were not as severe; and the other two, leases to the Georgia Pacific and the Lamoille Valley railroads, because they were subject to ICC approval. The court also suggested that with respect to the latter the unions might have acquiesced because, the work still being performed by railroads using, presumably, union employees, the impact on the unions was less severe.
 
 
 12
 As two examples, we note the following.
 
 
 13
 THE COURT: Isn't that important in using those instances of prior practice to determine what the parties mutually understand the language of the contract to mean? Isn't it important to see if there are factors, factual distinctions in these situations, which might occasion, for example the union, to think that its position was weak with respect to the Georgia Pacific and the Lamoille Valley situation, whereas here, in this situation, where there are going to be, as a result of strictly private arrangements by Boise Cascade, other individuals employed to do this switching and maintenance work, they might think their position was stronger. In other words that the language of the contract might cover one situation, namely this one, and not the other.
 
 
 14
 * * *
 
 
 15
 THE COURT: Carter Milling can be distinguished from the present situation on the basis that it did not involve, at least as significant job consequences for union employees?
 
 
 16
 We agree that there are differences that distinguish those cases factually from this one, but there are ways in which they relate, and it is not the court's role to choose, or speculate as to their practical effect. Under the law, resolution is committed to the arbitrator, who possesses expertise no court can hope to replicate. This is not to say that a party, simply by conjuring up instances of past practice and claiming they support its position, can successfully characterize a dispute as minor. The court's role, however, is only to determine whether that claim is "so obviously insubstantial as to be an attempt to circumvent [the "major dispute" provisions of the Act]," Airline Stewards, ante, 412 F.2d at 291. The degree of scrutiny, while ill-defined, is clearly light. When, as here, the court weighs a party's reasons for not protesting an instance that on its face bears some similarity to the dispute at issue, it has looked too hard.
 
 
 17
 Whether this is what the court did is a close question. Past practice is not indicative of the meaning of the contract or, to put it another way, is not a part of the total contract, unless it was accepted. This is basic contract law. In the Georgia Pacific case the lease arrangement was put through by ICC approval (affirmed by the District Court), over the continuous, though unsuccessful, objection of the UTU. This clearly took it out of the contract. Brotherhood of Locomotive Engineers v. Boston & Maine Corp., 788 F.2d 794, (1st Cir. 1986). It is perhaps arguable that the Lamoille Valley ICC matter is not so readily disposed of, since the union there voiced no objection. As against this, however, it would seem arguable that the union's acquiescence was not in recognition of the contract, but because of satisfaction with the so-called Mendocino Coast employee protection conditions (354 I.C.C. 732 (1978), as modified at 360 I.C.C. 653 (1980)). We need not resolve this question, however. The Carter Milling matter was free of any strings. While in many cases it might well be doubted whether a single instance could be regarded as a practice that "had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of [the agreement]," Detroit & Toledo Shore Line, ante, 396 U.S. at 154, 90 S.Ct. at 301; cf. Baker v. Railroad Yardmasters of America, 347 F.Supp. 215, 218 (E.D.Pa.1972), aff'd. 480 F.2d 917 (3d Cir.), we think that in this instance it could have. A lease of track to a customer, as opposed to another carrier, might well be so rare an occurrence that one instance would be enough. This is a matter of degree. We cannot quite say that MEC's argument is totally implausible.
 
 
 18
 Nor, though argued extensively by appellees, is this a matter where the district court's resolution is to be accepted unless clearly erroneous (F.R.Civ.P. 52(a)). In fact, precisely the opposite principle applies--the court is not empowered to make findings of fact. "[W]hether the contractual defense is frivolous," Airline Stewards, ante, 412 F.2d at 291, was negated freely by us both there and in Carbone v. Meserve, ante, without reference to Rule 52(a). The cases appellees cite for the proposition that the court's "factual findings were justified" in no way contradict this proposition. That on an interlocutory appeal from a preliminary injunction weight may be given to the district court's findings of a likelihood of success, Local 553, TWU v. Eastern Airlines, 695 F.2d 668 (2d Cir.1983), is a different matter entirely.
 
 
 19
 We conclude that the dispute between the parties is minor. MEC, having shown to the satisfaction of the first judge that the risk of interference with the Act's resolution process, viz., a strike, was serious, is entitled to the injunction it sought. A court, in its discretion, may attach conditions to the injunction to avoid irreparable injury, see, Brotherhood of Locomotive Engineers v. Missouri-K.-T. R.R., 363 U.S. 528, 533-34, 80 S.Ct. 1326, 1329-30 4 L.Ed.2d 1379 (1960), but the second judge's commendable statement, to complete the ruling for appeal, that the unions had "not made a showing of irreparable injury justifying entry of an injunction against the carrier if the dispute is found to be 'minor,' " takes that question out of the case. Accordingly, we reverse the "status quo" prior-to-the-lease injunction, and remand with instructions that the court enter an order enjoining UTU and BMWE from striking during the pendency of the procedures prescribed by 45 U.S.C. Sec. 153.
 
 
 
 *
 Of the District of Rhode Island, sitting by designation