**CSX TRANSPORTATION, INC.,
Plaintiff-Appellee,**

v.

**UNITED TRANSPORTATION UNION,
et al., Defendants–Appellants.**

**No. 1554, Docket 88–7461.**

United States Court of Appeals,
Second Circuit.

Argued July 18, 1988.
Decided June 7, 1989.

John O'B. Clarke, Jr., Washington, D.C. (Highsaw & Mahoney, P.C., Washington, D.C., John F. Collins, Collins, Collins & DiNardo, Buffalo, N.Y., of counsel), for defendants-appellants.

Ronald M. Johnson, Washington, D.C. (Brett A. Perlman, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., Courtland R. Levalee, Moot & Sprague, Buffalo, N.Y., T.L. Samuel, Nicholas S. Yovanovic, CSX Transportation, Inc., Jacksonville, Fla., of counsel), for plaintiff-appellee.

Before ALTIMARI and MAHONEY, Circuit Judges, and DEARIE, District Judge.[*]

MAHONEY, Circuit Judge:

This appeal presents for review an order of the United States District Court for the Western District of New York, John T. Curtin, *Judge*, which granted a permanent injunction barring defendants-appellants, certain labor organizations and officers thereof, from engaging in any "strike, picketing, patrolling, self-help or disruptive be-

---

[*] The Honorable Raymond J. Dearie, United States District Judge for the Eastern District of New York, sitting by designation.

havior" to prevent or interfere with the sale by CSX Transportation, Inc. ("CSX") of a line of railroad between Buffalo, New York and Eidenau, Pennsylvania (the "Buffalo–Eidenau line") to the Buffalo and Pittsburgh Railroad, Inc. ("B & P"), a newly formed corporation.

The specific question presented to the district court by this action for injunctive and declaratory relief was whether CSX was obliged to refrain from completing the sale of the Buffalo–Eidenau line pending bargaining under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–188 (1982), over the effects of the sale on the employees of that line. The Interstate Commerce Commission ("ICC") had granted expedited approval of the proposed sale without imposition of labor protective conditions.

In the opinion below, *Decker v. CSX Transp., Inc.*, 688 F.Supp. 98 (W.D.N.Y. 1988) (*"Decker II"*), the district court first determined that the dispute resolution processes of the RLA were not preempted by the ICC's authorization of the line sale. *Id.* at 107–09. The court went on to hold, however, that the controversy between CSX and appellants should be categorized as a "minor dispute" under the RLA, since a "plausible interpretation" of the pertinent agreements between the parties (the "Agreements") would justify CSX's action in selling the Buffalo–Eidenau line without prior bargaining with appellants concerning the affected employees. *Id.* at 109–12. The district court accordingly determined that the controversy was "subject to the RLA's formal grievance process while the sale goes through," *id.* at 109, and enjoined appellants from striking to prevent or impede the sale of the Buffalo–Eidenau line.

In accordance with the district court order, the parties brought this dispute before Special Board of Adjustment No. 1018 (the "Board") for arbitration pursuant to RLA § 3 Second, 45 U.S.C. § 153 Second (1982). On December 15, 1988, while this appeal was pending, the Board determined that CSX did not "have the unilateral right, under existing collective bargaining agreements or past practice, to abolish its positions in connection with the sale of the Buffalo–Eidenau line without first negotiating with the [appellant unions] as to the affected employees." Board Determination dated December 15, 1988 at 5, 21. Appellants then moved this court to vacate and remand based upon the Board's decision.

The order of the district court granting a permanent injunction is affirmed. Appellants' post-argument motion to vacate and remand is denied.

## Background

CSX is a Class 1 railroad, *see* 45 U.S.C. § 151 First (1982), subject to the jurisdiction of the ICC under the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 10101–11917 (1982 & Supp. IV 1986). CSX is also a "carrier" within the meaning of the RLA, *see* 45 U.S.C. § 151 First (1982), and thus subject to its directives regarding labor relations. Appellants are labor organizations and certain named officers of those organizations which represent various crafts or classes of CSX employees. They are "representatives" within the meaning of the RLA, *see* 45 U.S.C. § 151 Sixth (1982).

CSX owns and operates over 21,000 miles of rail lines in twenty states and in the province of Ontario, Canada. Prior to July 19, 1988, this system included a 369–mile line of railroad between Buffalo, New York and Eidenau, Pennsylvania. The Buffalo–Eidenau line had formerly been part of the Baltimore and Ohio Railroad ("B & O"), which was merged into CSX in 1987. CSX administered all collective bargaining agreements between the former B & O and the unions representing employees on the Buffalo–Eidenau line.

CSX had for some time sought a buyer for the Buffalo–Eidenau line because traffic on that line had decreased to a point of marginality (defined by testimony in the district court as the point where a line is not earning the corporate rate of return on investment, or is experiencing a traffic loss which, if uncorrected, would lead to eventual abandonment). In the late summer of 1987, CSX found a prospective purchaser for the Buffalo–Eidenau line, B & P. At

that time, the CSX corporate rate of return was 11.5%, and the rate of return on the Buffalo–Eidenau line was 1.4%.

Upon learning of CSX's intention to sell, several appellant unions served notices upon CSX pursuant to RLA § 6, 45 U.S.C. § 156 (1982), of "an intended change in agreements affecting rates of pay, rules, or working conditions," *id.* The unions sought thereby to preserve the status quo until the effects of the proposed sale on railroad employees could be assessed and negotiated. CSX responded that these notices violated the moratorium provisions of the Agreements,[1] and that in any event, the sale of the Buffalo–Eidenau line was subject to the ICC's exclusive jurisdiction, rendering the status quo requirements of the RLA inapplicable.

On August 31, 1987, representatives of the United Transportation Union ("UTU"), a defendant-appellant here, filed suit against CSX in New York State Supreme Court to enjoin CSX from altering the status quo as it existed with respect to the Buffalo–Eidenau line on the date the first Section 6 notices were filed. The case was thereafter removed to the United States District Court for the Western District of New York.

On September 16, 1987, CSX entered into a letter of intent with B & P to sell the Buffalo–Eidenau line to B & P. Shortly thereafter, B & P filed a notice of exemption with the ICC under 49 C.F.R. § 1150.31 (1987) for exemption from the prior approval requirements of 49 U.S.C. § 10901 (1982). *See Ex Parte No. 392 (Sub–No. 1), Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. 10901,* 1 I.C.C.2d 810 (1985) (rulemaking proceeding where a class of such transactions was initially exempted from regulation under § 10901), *review denied mem. sub nom. Illinois Commerce Comm'n v. ICC,* 817 F.2d 145 (D.C. Cir.1987). The exemption was granted and became effective on September 29, 1987.

By order dated October 13, 1987, the ICC denied a UTU request for a stay of the exemption's effectiveness.

B & P's corporate parents also joined B & P in seeking an exemption pursuant to 49 U.S.C. 10505 (1982) from the common control approval requirements of 49 U.S.C. § 11343 (1982). An ICC order dated December 21, 1987 granted the exemption, thereby authorizing B & P's parent corporations to control B & P and paving the way for the sale of the Buffalo–Eidenau line to be completed. *Genesee & Wyoming Industries, Inc., The Arthur T. Walker Estate Corp., Dumaines and B. & P. R.R. Exemption—Continuance in Control,* I.C.C. Decision Finance Docket No. 31117 (December 21, 1987).

Meanwhile, on November 3, 1987, the district court dismissed UTU's complaint in the removed injunction action in reliance upon this Court's decision in *RLEA v. Staten Island R.R. Corp.,* 792 F.2d 7 (2d Cir. 1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987), reasoning that the requested issuance of a status quo injunction would impermissibly interfere with the ICC's order of exemption. *Decker v. CSX Transp., Inc.,* 672 F.Supp. 674 (W.D. N.Y.1987) *("Decker I"), vacated,* 688 F.Supp. 98 (W.D.N.Y.1988).

On October 29, 1987, just prior to that dismissal, CSX commenced the instant action against UTU, eleven other labor organizations and twenty-seven union officials. The complaint sought a declaratory judgment that CSX was under no statutory obligation to negotiate with defendants with respect to the proposed sale of the Buffalo–Eidenau line to B & P, and an injunction preventing the unions from "exercising any self-help including, without limitation, a strike" in order to prevent or impede the sale.

Before answering the complaint in the instant action, appellants moved the district court to reconsider and vacate its order of dismissal in *Decker I,* pursuant to Fed.R.

---

1. A typical moratorium provision under the Agreements stated:

    [N]o party to the Agreement shall serve, prior to April 1, 1988 (not to become effective be-

fore July 1, 1988), any notice or proposal for the purpose of changing the subject matter of the provisions of this Agreement....

Civ.P. 59(a)(2), and to consolidate the two actions, pursuant to Fed.R.Civ.P. 42(a). Appellants then answered CSX's complaint, asserting a counterclaim for judgment against CSX requiring that the status quo be maintained until "all [RLA] major dispute resolution processes have been exhausted," and enjoining any sale of the Buffalo–Eideneau line pending such exhaustion. Appellants also moved to dismiss CSX's complaint, insofar as it requested an injunction against a strike, on the ground that section 4 of the Norris–LaGuardia Act, 29 U.S.C. § 104 (1982), deprived the court of jurisdiction to enjoin strike activity,[2] and for a preliminary injunction barring CSX from altering the rates of pay, rules, and working conditions of its employees on the Buffalo–Eidenau line *pendente lite.*

On March 26, 1988, CSX posted notices that the sale of the Buffalo–Eideneau line would be completed on April 6, 1988, and that just prior to that date certain jobs on the line would be abolished. Pursuant to the sales agreement, B & P had an obligation to offer employment to at least 160 of the approximately 226 CSX employees then working on the Buffalo–Eideneau line. As of May 26, 1988 (the date *Decker II* was decided), B & P had made job offers to 184 of these employees, of which 113 had been accepted. The sales agreement, however, did not require B & P to assume the administration of the Agreements, thus enabling B & P to establish its own terms of employment and related agreements with these employees.

On April 5, 1988, the district court ordered an evidentiary hearing on all the pending motions. That hearing was held on April 13–19, 1988. In the meantime, the court ordered that the status quo be maintained until a decision on the motions was rendered.

On May 26, 1988, the district court issued its decision. The court vacated its order in *Decker I,* and consolidated that case with *Decker II,* concluding that it had erred in its initial ruling that the ICA precluded application of the RLA to the Buffalo–Eidenau dispute. *See Decker II,* 688 F.Supp. at 107–09.[3] In so concluding, the district court relied upon the Third Circuit's decision in *RLEA v. Pittsburgh & L.E. R.R.,* 845 F.2d 420 (3d Cir.1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988), which held that the ICA did not preempt the field of labor protection in rail transportation transactions.

The district court accordingly undertook an analysis of the relevant provisions of the RLA, and determined that the instant action presented a "minor dispute" under settled principles governing the resolution of RLA controversies. *Decker II,* 688 F.Supp. at 109–12. The court held that CSX's claimed contractual defense was "plausible" under the language of the relevant collective bargaining agreements, and the dispute was therefore subject to binding arbitration under the exclusive jurisdiction of RLA adjustment boards. *Id.; see* RLA § 3, 45 U.S.C. § 153 (1982).

On June 2, 1988, the district court entered an order enjoining appellants from engaging in any strike or other concerted activity to prevent or impede the sale of the Buffalo–Eidenau line; requiring CSX to bargain with appellants over "notices served pursuant to Section 6 of the Railway Labor Act, 45 U.S.C. § 156, on or after April 1, 1988, in connection with the sale of the Buffalo–Eidenau Line," *see supra* note 1, while permitting the sale of the Buffalo–Eidenau line to proceed; and denying appellants' application for further declaratory and injunctive relief. The court also stayed its permission of the sale of the Buffalo–Eidenau line until June 16, 1988 to allow time for an application to this court concerning the matter. This court extended that stay pending expedited appeal. The stay was subsequently vacated on July 18, 1988 af-

---

**2.** This contention was not pursued on appeal. *Cf. Long Island R.R. v. IAM,* 874 F.2d 901, 906–08 (2d Cir.1989) (discussing interplay between RLA and Norris–LaGuardia Act regarding injunctions in labor disputes).

**3.** The ruling vacating the prior order has not been appealed, and we accordingly do not address that ruling.

ter oral argument, and the sale was completed on July 19, 1988.

On July 15, 1988, just prior to the oral argument of the instant appeal, the parties submitted their dispute concerning the sale of the Buffalo–Eidenau line to the Board for arbitration pursuant to RLA § 3 Second, 45 U.S.C. § 153 Second (1982). A hearing was conducted on October 18, 1988, and as indicated earlier, the Board decided in favor of appellants on December 15, 1988, concluding that: "there is no written language support [in the Agreements] for [CSX's] position," Board determination at 18; and that past practice did not authorize a sale of the Buffalo–Eidenau line by CSX without bargaining over the sale's effects on employees because appellants had never "relinquished their right to seek protection, by whatever means, for their affected members," *id.* at 20. The concluding "Award" of the Board Determination, however, stated only that: "The questions set before the Board are disposed of as provided in the Findings and Conclusions herein." *Id.* at 26.

Appellants thereafter moved this court to vacate the district court order (and the permanent injunction therein granted) and remand for consideration of appellants' counterclaims, "[s]ince there is no longer a basis for concluding that appellee [CSX] has a contractual right to abolish jobs without first bargaining." This opinion accordingly addresses both the original appeal and appellants' post-argument motion.

We are advised by the parties in their submissions on the pending motion that CSX has initiated an action in the United States District Court for the Western District of New York to review the Board's determination pursuant to RLA § 3 First (q), 45 U.S.C. § 153 First (q) (1982).

## Discussion

### A. The Applicable Law.

■ Determinations regarding the major or minor nature of a dispute under the RLA are questions of law which circuit courts review *de novo*. *IAM, Dist. Lodge No. 19 v. Soo Line R.R.*, 850 F.2d 368, 374 (8th Cir.1988); *Brotherhood of Locomotive Eng'rs v. Burlington N. R.R.*, 838 F.2d 1087, 1089 (9th Cir.1988).

The RLA was enacted in 1926 to regulate labor relations in the nation's railroads and to prevent interruptions in rail service by encouraging labor peace while avoiding rail strikes. *See* 45 U.S.C. § 151a (1982); *Detroit & T. Shore Line R.R. v. UTU*, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969). The statute provides two distinct dispute resolution schemes designed to accomplish these purposes. These schemes were clearly differentiated by the Supreme Court in *Elgin, J. & E. Ry. v. Burley*, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945). In that case, the Court construed the RLA to address two classes of controversy, "major" and "minor" disputes, stating:

> [I]t is clear from the [Railway Labor] Act itself, from the history of railway labor disputes and from the legislative history of the various statutes which have dealt with them, that Congress has drawn major lines of difference between the two classes of controversy.
>
> The first [major disputes] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
>
> The second class [minor disputes], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries.

In either case the claim is to rights accrued, not merely to have new ones created for the future.

In general the difference is between what are regarded traditionally as the major and the minor disputes of the railway labor world.

*Id.* at 722–23, 65 S.Ct. at 1289–90 (footnote omitted).[4]

This court has also addressed the distinction between major and minor disputes:

It is a major dispute if the present agreements between the railroad and the brotherhoods contain express provisions contrary to the position taken by the railroads or if the clear implication of these agreements is inconsistent with the railroad's proposals. It is a minor dispute if there is a clearly governing provision in the present agreements, although its precise requirements are ambiguous; and it is also minor if what the railroad seeks to do is supported by customary and ordinary interpretations of the language of the agreements.

*Rutland Ry. Corp. v. Brotherhood of Locomotive Eng'rs,* 307 F.2d 21, 33–34 (2d Cir.1962), *cert. denied,* 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963).

The "major dispute" procedure is initiated by a carrier or union providing at least thirty days' written notice (a "Section 6 notice") "of an intended change in agreements affecting rates of pay, rules or working conditions" pursuant to RLA § 6, 45 U.S.C. § 156 (1982). The first phase of the resolution scheme is mandatory negotiation between the parties. *Id.* Failing agreement, either party may request medi-

ation by the National Mediation Board ("NMB"), or the NMB may proffer its services "in case any labor emergency is found by it to exist at any time." RLA § 5 First, 45 U.S.C. § 155 First (1982); *see generally* RLA §§ 4 (establishing the NMB) and 5 (describing its functions), 45 U.S.C. §§ 154 and 155 (1982). In either event, mediation before the NMB then takes place.

If the NMB determines after mediation that the parties have reached an impasse, the NMB must "endeavor . . . to induce the parties to submit their controversy to arbitration," RLA § 5 First, 45 U.S.C. § 155 First (1982), but arbitration may occur only if the parties agree thereto, *id.* § 7 First, 45 U.S.C. § 157 First (1982). Unless the parties agree to arbitration, there is a further thirty-day "cooling off" period during which the status quo must be maintained, RLA § 5 First, 45 U.S.C. § 155 First (1982), after which they may resort to economic self-help; *i.e.,* the union may strike and the carrier may unilaterally change terms and conditions of employment. In addition, if the NMB concludes that an unresolved major dispute "threaten[s] substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President, who may thereupon, in his discretion, create a board to investigate and report respecting such dispute." RLA § 10, 45 U.S. C. § 160 (1982). In that event, the parties must maintain the status quo until "thirty days after such board has made its report to the President." *Id.*

**4.** The concluding statement that the quoted description corresponds "[i]n general" to the "major and minor disputes of the railway labor world" can engender confusion, since the "major" and "minor" dispute terminology employed in *Elgin* does not appear in the statutory language of the RLA, but has generally been adopted in the cases subsequent to *Elgin.* As will be described in greater detail immediately hereinafter, a system of compulsory arbitration before the National Railroad Adjustment Board is provided for the resolution of "minor" disputes. A system of mediation before the National Mediation Board is provided, on the other hand, for the resolution not only of any "dispute concerning changes in rates of pay, rules or

working conditions not adjusted by the parties in conference," *see* RLA § 5 First (a), 45 U.S.C. § 155 First (a) (1982), a category which corresponds generally with the *Elgin* description of "major" disputes; but also of "*[a]ny other dispute* not referable to the National Railroad Adjustment Board," *see id.* § 5 First (b), 45 U.S.C. § 155 First (b) (1982) (emphasis added). It would therefore appear that the RLA adopts a comprehensive scheme which addresses *all* disputes between RLA carriers and employee representatives, and that the category of disputes amenable to RLA mediation procedures is accordingly not confined to the *Elgin* description of those which "in general" are "regarded traditionally" as "major".

Once a party has served a Section 6 notice, the status quo must be maintained until the negotiation, mediation, and cooling off periods have expired. *Shore Line*, 396 U.S. at 150–53, 90 S.Ct. at 299–301. The RLA's major dispute process has been described as "purposely long and drawn out...." *Brotherhood of Ry. & Steamship Clerks v. Florida E. Coast Ry.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed. 2d 501 (1966). While parties are required to submit to the successive negotiation, mediation, and cooling off phases of the major dispute resolution scheme, this requirement only ensures that the procedures will be exhausted; "[n]o authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration." *Elgin*, 325 U.S. at 725, 65 S.Ct. at 1291.

The RLA provides a very different regimen for the resolution of "disputes ... growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions." [5] After the initial negotiation stage, parties are not free to agree or disagree at will. Rather, either party may submit the dispute for resolution through *binding* arbitration to the National Railroad Adjustment Board ("NRAB"), 45 U.S. C. § 153, First (i) (1982), or to other boards of adjustment upon which the parties agree, 45 U.S.C. § 153 Second (1982).

■ The status quo provisions of the RLA generally do not apply in minor disputes, enabling the carrier to act on its own interpretation pending arbitration.[6] *Burlington N. R.R. v. UTU*, 862 F.2d 1266, 1272 (7th Cir.1988); *Maine Cent. R.R. v. UTU*, 787 F.2d 780, 781 (1st Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986); *Local 553, Transport Workers Unions v. Eastern Air Lines*, 695 F.2d 668, 675 (2d Cir.1982); *Empresa Ecuatoriana de Aviacion, S.A. v. District Lodge No. 100*, 690 F.2d 838, 844 (11th

Cir.1982), *cert. dismissed*, 463 U.S. 1250, 104 S.Ct. 40, 77 L.Ed.2d 1457 (1983). A strike over a minor dispute is illegal because it undermines the exclusive jurisdiction of the adjustment board, *see Burlington*, 862 F.2d at 1272; *Chicago & N.W. Transp. Co. v. RLEA*, 855 F.2d 1277, 1283, 1287 (7th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988); *Empresa Ecuatoriana*, 690 F.2d at 844, and federal courts may enjoin such strikes. *Brotherhood of R.R. Trainmen v. Chicago River & I. R.R.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *Empresa Ecuatoriana*, 690 F.2d at 844. The NRAB has broad authority in minor disputes to grant relief and make employees whole if the unions ultimately prevail before the Board. *See, e.g., Brotherhood of R.R. Trainmen v. Central of Georgia Ry.*, 415 F.2d 403, 415 (5th Cir.1969), *cert. denied*, 396 U.S. 1008, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970); *International Bhd. of Firemen v. Consolidated Rail Corp.*, 560 F.Supp. 169, 178 (S.D.Ohio 1982).

■ In cases where a carrier contends that a given controversy is a minor dispute, courts have typically looked to the pertinent collective bargaining agreements to determine whether a "plausible interpretation would justify the carrier's action." *Local 553*, 695 F.2d at 673; *see Baylis v. Marriott Corp.*, 843 F.2d 658, 663 (2d Cir. 1988). "A dispute is major if the carrier's contractual justification for its actions is 'obviously insubstantial.'" *Local 553*, 695 F.2d at 673 (quoting *UTU v. Penn Central Transp. Co.*, 505 F.2d 542, 544 (3d Cir.1974) (per curiam)). A dispute will be considered minor, on the other hand, if the contract is "reasonably susceptible" to the carrier's interpretation. *Id.* (quoting *UTU v. Burlington N., Inc.*, 458 F.2d 354, 357 (8th Cir.1972)).

It must therefore be determined whether the carrier's contractual position is "so ob-

---

**5.** It is noteworthy that the dispute resolution process next to be considered applies not only to the "minor" disputes described in *Elgin*, 325 U.S. at 723, 65 S.Ct. at 1290, but also to "disputes ... growing out of grievances." *Compare supra* note 4, pointing out that the RLA media-

tion procedures apply to all non-arbitrable disputes, whether or not falling within the "general" *Elgin* description of "major" disputes.

**6.** *But see infra* note 10.

viously insubstantial as to warrant the inference that it is raised with intent to circumvent the procedures prescribed by § 6 for alteration of existing agreements." *Southern Ry. v. Brotherhood of Locomotive Firemen*, 384 F.2d 323, 327 (D.C.Cir. 1967); *see National Ry. Labor Conference v. IAM*, 830 F.2d 741, 746 (7th Cir.1987); *Atchison, T. & S.F. Ry. v. UTU*, 734 F.2d 317, 321 (7th Cir.1984). This approach is consistent with the concern for minimizing the occurrence of strikes in the rail transportation industry. *See Chicago & N.W. Transp.*, 855 F.2d at 1283. Finally, "customary and ordinary interpretations of the language of the agreements," *see Rutland*, 307 F.2d at 34, as well as prior practice between the parties, *see Shore Line*, 396 U.S. at 153–55, 90 S.Ct. at 301–02, may be considered.[7]

**B. Characterizing the Present Dispute.**

■ Based upon the principles articulated above, the district court found that a "plausible interpretation of the collective bargaining agreements in effect between [CSX] and the defendant unions would provide a substantial contractual justification for the sale of the Buffalo–Eidenau line without additional bargaining." *Decker II*, 688 F.Supp. at 112. The dispute between the parties was accordingly deemed minor and subject to binding arbitration before an adjustment board, *id.*, pursuant to RLA § 3, 45 U.S.C. § 153 (1982).

Appellants contend, however, that the dispute arises from an action by CSX which will change existing employment rights of CSX employees as currently embodied in the Agreements, and as presenting a legitimate attempt by appellants to negotiate *new* agreements for the affected employees.

The district court's finding that the dispute was minor was grounded on two bases: 1) the existence of various reduction-in-force ("RIF") provisions in the Agreements, *Decker II*, 688 F.Supp. at 110–11;

and 2) CSX's allegedly established practice of selling or abandoning rail lines without engaging in RLA bargaining over related job abolitions, *id.* at 111–12. We next consider these matters.

**1. *Textual provisions of the collective bargaining agreements.***

CSX's principal argument that the instant dispute is covered in the Agreements is premised upon the RIF provisions of those Agreements. The district court cited a typical RIF clause, which provides in relevant part:

(a) When it becomes necessary to reduce expenses, the forces at any point or in any department or subdivision thereof shall be reduced, seniority to govern; and employees affected to take the rate of the job to which they are assigned. (b)(1) Five working days advance notice will be given to employees affected before the abolishment of positions or reduction in force, and list of employees affected will be furnished to the local committee. . . .

*Decker II*, 688 F.Supp. at 110. CSX contends that these RIF procedures are applicable to job abolishments resulting from line sales, as well as other changes in CSX's operations.

The district court found that the pertinent collective bargaining agreements also provided for various labor protections and furlough benefits for terminated employees, and that in the last previous (1984) round of collective bargaining, some of the appellant unions had traded off demands for new or enhanced protective provisions for other benefits. *See Decker II*, 688 F.Supp. at 104 & n. 7 (detailing labor protections and furlough benefits).

Appellants dispute the applicability of the RIF provisions, and point to the fact that they do not refer specifically to line sale situations. Appellants contend that the RIF provisions only allow management

---

7. As noted in *ALPA v. Eastern Air Lines*, 863 F.2d 891, 896 (D.C.Cir.1988), "[a]lthough [*Shore Line*] dealt with the working conditions that constitute the status quo, subsequent courts have inferred from the holding that past practice is a relevant consideration in the dispute classification process as well."

to abolish a position for which work "has disappeared." Distinguishing the situation presented by the sale of the Buffalo–Eidenau line, appellants argue that here work did not *disappear,* but rather was *transferred* by a deliberate action of the carrier. Appellants note in this regard that many of the CSX employees who worked on the Buffalo–Eidenau line had seniority rights specific to that line which would not survive a sale under which B & P did not assume any obligation to continue to administer the Agreements providing those rights.

Appellants also contend that the district court, by concluding that the controversy presented for determination was a minor dispute, "improperly abdicated its exclusive jurisdiction to determine what the status quo is which the Railway Labor Act requires to be maintained during bargaining under that statute."

Addressing the last contention first, it seems to us that appellants have the situation analytically backward. As indicated earlier, there is generally no duty to maintain the status quo during a minor dispute, but only during a major dispute.[8] *Air Cargo, Inc. v. Local Union 851, IBT,* 733 F.2d 241 (2d Cir.1984), for example, on which appellants place considerable reliance, ruled that *"while the major dispute procedures of section 6 are being carried out,* the district court has exclusive jurisdiction to ensure that the status quo is being maintained.... [and] therefore ... to determine what the status quo is." *Id.* at 247 (emphasis added). It is accordingly necessary to address, as a threshold matter, the nature of the controversy between the parties. Once the district court ruled that the controversy was a minor dispute, the status quo issue upon which appellants rely was mooted.

The question remains, of course, whether the district court correctly ruled that a minor, rather than major, dispute was before it. As indicated earlier, the district court was only required to conclude that CSX's position was "plausible," *see Local 553,* 695 F.2d at 673, and not "obviously

insubstantial," *see Southern Ry.,* 384 F.2d at 327. We conclude that CSX met this relatively light burden with respect to interpretation of the pertinent labor agreements, and that the district court properly so concluded. Any further inquiry by the district court would have been unwarranted, since "it is not for [the court] to weigh, and decide who has the better of the argument. If the court [does] this, it overstep[s] its bounds and usurp[s] the arbitrator's function." *Maine Cent. R.R.,* 787 F.2d at 782.

### 2. *Past Practice.*

As indicated earlier, CSX also supports its position by pointing to its past practice of selling or abandoning rail lines without engaging in RLA bargaining over those sales and abandonments. As the First Circuit stated in *Brotherhood of Locomotive Eng'rs v. Boston & Maine Corp.,* 788 F.2d 794 (1st Cir.), *cert. denied,* 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986):

> In defending an operation change as not raising a major dispute, a carrier is not limited to the collective bargaining agreement to show the basis for its action. The Supreme Court has stated that the carrier can rely on "those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement." *Detroit & Toledo Shore Line Railroad v. United Transportation Union,* 396 U.S. 142, 153, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). The Supreme Court has made clear that for a past practice to be considered an "actual, objective working condition[ ]", it must have occurred "for a sufficient period of time with the knowledge and *acquiescence* of the employees to become in reality a part of the actual working conditions." *Id.* at 154, 90 S.Ct. at 301 (emphasis supplied). Accordingly, in an opinion of this court also published today, we found a minor dispute where the carrier could identify "instances of past practice *accepted by the unions* which, arguably, could support its contention."

8. *But see infra* note 10.

*Maine Central Railroad v. United Transportation Union,* 787 F.2d 780, 782 (1st Cir.1986).

*Id.* at 799.

In the instant case, the district court found persuasive the fact that CSX had in the past accomplished ten separate sales of line segments, involving job abolishments and employee furloughs, without objection by appellants that these sales violated the Agreements or the RLA. Appellants contend, however, that there was no acquiescence on their part in these sales. Rather, their failure to initiate major dispute processes under the RLA in the past came about because other protections were available under the ICA.

It was only after a 1982 policy change, appellants contend, that the ICC began refusing to impose these employee protections in cases of rail line sales. Appellants point out that they unsuccessfully petitioned the ICC to change its position and then challenged that position in court. In addition, the district court found that at least one union, the UTU, served a Section 6 notice in connection with one prior sale, although the notice was later withdrawn when CSX contended that the notice violated the moratorium agreement in the CSX–UTU agreement, *see supra* note 1, and in any event that the ICC had exclusive jurisdiction over the sale. *See Decker II,* 688 F.Supp. at 111. Appellants contend, in summary, that they "attempted to obtain protection for affected employees through the ICC, the courts or by bargaining in each sale where such protections were not afforded by the ICC and employees were affected."

As stated earlier, a carrier is entitled to rely upon past practices which have been accepted by the affected unions as establishing an agreement between them. *See Brotherhood of Locomotive Eng'rs,* 788 F.2d at 799 (both stating rule and determining that carrier had not established acceptance of past practices). In view of the contested issues of fact concerning appellants' acquiescence in the prior sales by CSX, we give little weight to this consideration, and even less to prior abandonments which pose distinguishable legal and factual considerations, but nonetheless agree with the district court that CSX's position with respect to past practice is "arguable," *see Decker II,* 688 F.Supp. at 112, and lends some minimal support to a "minor dispute" determination which rests primarily upon the RIF provisions of the pertinent collective bargaining agreements.

### 3. *Creating a major dispute by issuing Section 6 notices.*

Appellants contend that CSX was required to file a Section 6 notice with respect to the sale of the Buffalo–Eidenau line and related job abolishments, and that the Section 6 notices which appellant unions filed after April 1, 1988, *see supra* note 1, make clear that "the underlying dispute in this case is clearly a major dispute, for [appellants are] seeking to acquire by bargaining rights which do not exist today." Appellants also point out that the order of the district court from which this appeal is taken contains the following provision:

> While [CSX] can proceed with the sale of the line, [CSX] is ordered to bargain with Defendant unions, consistent with the requirements of the Railway Labor Act, over notices served pursuant to Section 6 of the Railway Labor Act, 45 U.S.C. § 156, on or after April 1, 1988, in connection with the sale of the Buffalo–Eidenau line.

First, CSX was under no obligation to serve Section 6 notices if the job abolishments which it was undertaking with respect to the sale of the Buffalo–Eidenau line were authorized by its existing labor agreements. Since, as the district court concluded in *Decker II* and we conclude herein, those agreements may plausibly be interpreted to provide that authority, CSX was entitled to treat the controversy as a minor dispute, and therefore had no obligation to file Section 6 notices.

Second, assuming that a minor dispute is in fact presented, the service of Section 6 notices by the appellant unions would have no transforming or alchemizing effect upon that situation. As we stated in *Rutland:*

In reaching for resolution of this problem of course we must not place undue emphasis on the contentions or the maneuvers of the parties. Management will assert that its position, whether right or wrong, is only an interpretation or application of the existing contract. Unions, on the other hand, in their assertions about the dispute at issue, will obviously talk in terms of change. Since a Section 6 notice is required by the statute in order to initiate a major dispute, *the labor representatives are likely to serve such a notice* in any dispute arising out of an ambiguous situation so as thereby to make the controversy appear more like a major dispute. Or they may seek to bring the particular conflict at issue within the bounds of an outstanding Section 6 notice that in reality does not relate to that dispute.

307 F.2d at 33 (emphasis added) (citation omitted).

Appellants' assertion that, by giving their Section 6 notices, they were "seeking to acquire bargaining rights that [did] not exist," underscores the weakness of their position on this issue. If the agreements existing between CSX and the appellant unions governed the abolishment of positions in connection with the sale of the Buffalo–Eidenau line, rights which appellants might seek to obtain by bargaining for future agreements would manifestly be irrelevant to that controversy.

Finally, in view of the foregoing, we confess to being somewhat puzzled by the district court's direction that CSX bargain with appellants with respect to Section 6 notices served by them "on or after April 1, 1988, in connection with the sale of the Buffalo–Eidenau line." In any event, since the parties have since submitted the matter to arbitration before a special adjustment board in accordance with the district court's determination that it presented a minor dispute, and an award has been entered in that arbitration, this directive is presumably moot at this juncture.

4. *Analogous cases.*

The Seventh Circuit recently addressed a fact situation almost identical to that presented here in *Chicago & N.W. Transp. Co. v. RLEA*, 855 F.2d 1277 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 493, 102 L.Ed.2d 529 (1988). That case dealt with a line sale by Chicago & North Western Transportation Company ("C & NW") where, as here, the carrier obtained expedited ICC approval. The proposed sale was to result in the abolishment of over 300 jobs, and C & NW did not serve Section 6 notices. Upon learning of the sale, the affected unions filed Section 6 notices expressing a desire to negotiate various employment rights, including seniority protections. Subsequent strike threats were met with a motion for a temporary restraining order by C & NW, which led in turn to a cross-motion to enjoin the line sale. *Id.* at 1280.

As here, the district court determined that the dispute was minor and ordered a preliminary injunction forbidding any strike. The circuit court affirmed, concluding that collective bargaining agreements and past practices arising thereunder embraced matters of job abolishment involved in a line sale. *Id.* at 1284. While the court found C & NW's interpretations of the pertinent labor agreements to be "subject to challenge," they were "at least plausible," resulting in a determination that the controversy was a minor dispute. *Id.* at 1285.

Other cases support this analysis and result. In *Maine Cent. R.R. v. UTU*, 787 F.2d 780 (1st Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986), for example, it was held that job abolishments brought about by a lease of a rail line to a customer constituted a minor dispute, and an injunction was ordered against any strike by the affected unions during the pendency of arbitration procedures. *See also ALPA v. Eastern Air Lines*, 863 F.2d 891 (D.C.Cir.1988) (airline's net reduction of 143 flights per day causing furlough of 2222 union employees resulted in a minor dispute under pertinent agreements); *IAM v. Eastern Air Lines*, 826 F.2d 1141 (1st Cir.1987) (airline's layoff of 68 mechanics presented a minor dispute

over relocation of work); *RLEA v. Boston & Maine Corp.*, 808 F.2d 150, 159–60 (1st Cir.1986) (carriers' permanent abolition of positions covered by collective bargaining agreements constituted minor dispute because action "arguably" within carriers' contractual rights), *cert. denied*, 484 U.S. 830, 108 S.Ct. 102, 98 L.Ed.2d 62 (1987); *IBT v. Braniff Int'l Airways*, 437 F.2d 1272 (5th Cir.1971) (abolishment of twenty-five jobs arguably justified by contract interpretation); *St. Louis, S.F. & T. Ry. v. Railroad Yardmasters*, 328 F.2d 749 (5th Cir.) (permissibility of abolishment posed minor dispute because dependent upon contract interpretation), *cert. denied*, 377 U.S. 980, 84 S.Ct. 1886, 12 L.Ed.2d 748 (1964); *ALPA v. Eastern Air Lines*, 701 F.Supp. 865 (D.D.C.1988) (shuttle sale contemplated by past agreements and consistent with past practices presented minor dispute); *International Bhd. of Firemen v. Consolidated Rail Corp.*, 560 F.Supp. 169 (S.D. Ohio 1982) (abolition of numerous railroad positions presented a minor dispute); *Independent Union of Flight Attendants v. Pan Am. World Airways*, 502 F.Supp. 1013 (D.D.C.1980) (decision to close flight attendant bases and furlough approximately 1000 flight attendants posed a minor dispute).

The cases cited to us by appellant do not call for a different conclusion. *Burlington N. R.R. v. UTU*, 848 F.2d 856 (8th Cir. 1988), and *RLEA v. Chicago & Northwestern Transp. Co.*, 848 F.2d 102 (8th Cir. 1988), are companion cases which were addressed to the interplay between the ICA, the RLA and (in the case of *Burlington*) the Norris–LaGuardia Act, 29 U.S.C. §§ 101–115 (1982 & Supp. IV 1986). Both cases assumed the existence of a major dispute. There was no consideration in either case of the major/minor dispute dichotomy, or of the agreements between the parties upon which such an analysis must necessarily focus.

*RLEA v. Pittsburgh & L.E. R.R.*, 845 F.2d 420 (3d Cir.), *cert. granted*, — U.S. ——, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988), involved a sale by a railroad of all of its rail assets, in which the Third Circuit stated: "There is no argument about whether the collective bargaining agreement itself permits or prohibits the proposed sale. If *that* were the crux of the dispute, then this case would require an interpretation of the agreement, and would thus be a minor dispute...." *Id.* at 428 n. 9.

Similarly, *United Indus. Workers v. Board of Trustees*, 351 F.2d 183 (5th Cir. 1965), involved a lease of the carrier's entire railroad operations which would have terminated the employment of all its union employees. As the Fifth Circuit succinctly analyzed the situation, "during the term of the contract, the Carrier terminated the contract by going out of business." *Id.* at 189. The Fifth Circuit has since limited this case to its facts. *See Railway Express Agency v. Brotherhood of Ry. Clerks*, 437 F.2d 388, 393 (5th Cir.), *cert. denied*, 403 U.S. 919, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971); *see also Chicago & N.W. Transp.*, 855 F.2d at 1286 n. 3 (distinguishing *Pittsburgh & L.E. R.R.* and *United Indus. Workers* on the same grounds advanced herein).

In sum, after consideration of the pertinent provisions of the RLA, the agreements between the parties, the prior practices of the parties and the relevant case law, we agree with the district court that the controversy between the parties was a minor dispute justifying the permanent injunction issued by the district court.

### C. Effect of the Arbitration Award.

As stated earlier, in accordance with the district court's opinion and order, and while this appeal was pending, the parties submitted their dispute to arbitration pursuant to RLA § 3, 45 U.S.C. § 153 Second (1982), which resulted in a determination in favor of appellants. The concluding "Award" of that determination however, stated only that: "The questions set before the Board are disposed of as provided in the Findings and Conclusions herein." CSX has since commenced an action in the United States District Court for the Western District of New York to review the Board's determination, and appellants have moved this court that the district court's "order and permanent injunction be vacated and that this

case be remanded for further consideration of appellants' counterclaim." We now address that motion.

We are met at the outset by CSX's contention that appellants' motion is not properly before this court, because it is based upon facts not in the record of this appeal. CSX claims that "the proper procedure for seeking the vacation of a judgment which is on appeal requires that the party first seek an indication of the District Court's disposition to grant the motion before seeking a remand from this Court," citing *Litton Sys. v. AT & T*, 746 F.2d 168, 171 n. 4 (2d Cir.1984), and *Ryan v. United States Lines Co.*, 303 F.2d 430, 434 (2d Cir.1962).

We reject this contention. There is no indication in *Litton* or *Ryan* that the described procedure is mandatory in all cases, rather than an option to be utilized where appropriate in the circumstances. Here a question of law is presented on uncontested facts, and appellants contend in substance that the district court's order should be vacated as moot because of the subsequent event of the arbitral award. It is perfectly appropriate for us to consider such an application in the first instance. *See Cedar Coal Co. v. United Mine Workers*, 560 F.2d 1153, 1166 (4th Cir.1977), *cert. denied*, 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978); 13A C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3533.10, at 440–41 (2d ed. 1984).

■ We consider next appellants' application that we vacate the order of the district court and the permanent injunction which that order includes. Appellants contend that the Board's determination "vitiates the underlying basis for the district court's order and injunction in this case." We disagree, believing that this contention rests upon a fundamental misconception of the RLA process for the resolution of major and minor disputes.

To begin with, the district court determined only that CSX had an "arguable" or "plausible" position based upon the extant agreements between the parties, and that a minor dispute was thereby presented which should be arbitrated by an adjustment board pursuant to RLA § 3, 45 U.S.C. § 153 (1982). This was the proper course, since "[t]he resolution of minor disputes is within the exclusive jurisdiction of ... boards of adjustment ...," *IAM v. Eastern Air Lines*, 847 F.2d 1014, 1017 (2d Cir. 1988) (citing *Local 553*, 695 F.2d at 673–75); *see Chicago & N.W. Transp.*, 855 F.2d at 1286, and "courts may not adjudicate the merits of these issues." *Local 553*, 695 F.2d at 675.

The Board which conducted the arbitration thereafter determined that CSX's position, although "arguable" and "plausible," was, on careful analysis, unavailing. CSX has appealed that determination pursuant to RLA § 3 First (q), 45 U.S.C. § 153 First (q) (1982), but can prevail only by establishing "failure of the [Board] to comply with the requirements of this chapter, ... failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or ... fraud or corruption by a member of the [Board]." *Id.*

There is thus no conflict between the determinations of the district court and the Board, and the Board's decision in no way "vitiates the underlying basis" of the district court's order. On the contrary, absent a determination by the district court that the controversy between the parties was a minor dispute, there would have been no basis for Board jurisdiction over that dispute. Nor is there any conflict between the district court's conclusion that CSX's position was "plausible," and the Board's conclusion that CSX should nonetheless not prevail.[9]

**9.** As stated earlier, the Board determined that there was "no written language support" in the Agreements, and no support in past practice, for CSX's position that it could sell the Buffalo–Eidenau line without bargaining over the effect of the sale on employees. Had the district court reached this conclusion at the outset, it would presumably have treated the controversy as a major dispute, and CSX would have been re-

quired to maintain the status quo as to the affected employees, whether or not any transfer of the Buffalo–Eidenau line occurred, pending resolution of that major dispute by the prescribed RLA procedures.

The district court properly addressed only the question, however, whether CSX had a *plausible argument* that the RIF provisions of the Agree-

Furthermore, the obvious implication of appellants' application to vacate the district court's anti-strike injunction is that, having prevailed before the Board, appellants are now entitled to strike. This contention counters both the general purposes of the RLA to "avoid any interruption to commerce or to the operation of any carrier engaged therein" and "to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions," RLA § 1a, 45 U.S.C. 151a (1982); the corresponding duty imposed upon carriers and employees by RLA § 2 First, 45 U.S.C. § 152 First (1982), *see Chicago & N.W. Ry. v. UTU*, 402 U.S. 570, 577, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971); and the specific provisions of RLA § 3 First (p) and (q), 45 U.S.C. § 153 First (p) and (q) (1982), providing for judicial enforcement or review of arbitration awards rendered by RLA adjustment boards.

As indicated earlier herein, the RLA dispute resolution process is structured to allow strikes at the end of the lengthy process provided for the resolution of major disputes, but to subject minor disputes to binding arbitration and forbid strikes with respect to them. As we stated in *Local 553*, "[a]s a result of the 1934 amendments [making arbitration of minor disputes compulsory], the RLA for the first time offered a means of resolving technical disputes between labor and management *without the risk of strike or work stoppages* or prolonged litigation." 695 F.2d at 675 (emphasis added). Appellants cite no authority for the startling proposition that, having prevailed in the arbitration of what the district

court correctly deemed a minor dispute, they are entitled to strike. For the foregoing reasons, we conclude that they are not so entitled.

Rather, as we indicated earlier and as the Seventh Circuit made clear in *Chicago & N.W. Transp.*:

> Strikes over minor disputes violate the RLA and may be enjoined by the federal courts in order to effectuate the RLA's purpose to provide for the compulsory arbitration of such matters by the NRAB.

Thus, it is clear that the federal courts may issue injunctions against strikes in minor disputes in order to protect the NRAB's exclusive jurisdiction over such matters. Because injunctions barring strikes in minor disputes are necessary to ensure the proper functioning of the § 3 RLA procedures, they are not proscribed by the *Norris–LaGuardia Act.*

855 F.2d at 1287 (citations omitted).

Similarly, we see no basis for a remand to the district court for consideration of appellants' counterclaim. That counterclaim seeks a declaration that CSX "may not change the rates of pay, rules and working conditions of employees on [the Buffalo–Eidenau line] until the [RLA] *major dispute resolution processes* have been exhausted" (emphasis added), and corresponding injunctive relief.[10] The district court concluded, however, as we have, that this controversy is a minor dispute. The Board's arbitral determination does nothing to alter that conclusion, and indeed is in no way directed to that question. *See supra* note 9; *see also General Comm. of Ad-*

---

ments authorized a sale without bargaining. Its correct affirmative response to that question set in motion the RLA's minor dispute processes, and the controversy between the parties must be resolved in accordance with those processes.

**10.** So far as we are aware, there was never any application to the district court for an injunction to preserve the status quo pending the resolution of the arbitration before the adjustment board. Some cases have declared that courts are not empowered to issue such "minor dispute" injunctions. *See, e.g., Detroit Bhd. of Locomotive Eng'rs v. Consolidated Rail Corp.*, 844 F.2d 1218, 1224 (6th Cir.1988); *IAM v. Eastern*

*Air Lines,* 826 F.2d 1141, 1151 (1st Cir.1987) (collecting cases). This circuit, however, has stated that such an injunction "is appropriate ... in those instances when it appears that its absence would prevent the Adjustment Board from giving a significant remedy to the side that prevails before the Board." *Local 553,* 695 F.2d at 675 (citing *Brotherhood of Locomotive Eng'rs v. Missouri–Kan.–Tex. R.R.*, 363 U.S. 528, 534, 80 S.Ct. 1326, 1330, 4 L.Ed.2d 1379 (1960), and *Westchester Lodge 2186 v. Ry. Express Agency,* 329 F.2d 748, 752–53 (2d Cir.1964)). We do not address this issue, which would in any event be moot at this juncture.

*justment v. CSX R.R. Corp.*, Civ. No. 87–1712, slip op. at 9 (M.D.Pa. Feb. 24, 1989) ("[o]nly the courts have jurisdiction to rule on the issue of whether a dispute is minor or major"). There is accordingly no basis for a remand to consider appellants' counterclaim.

Finally, we address the primary concern which appears to motivate appellants' motion to vacate and remand. Both here and in a petition for rehearing of the denial of certiorari in *RLEA v. Chicago & N.W. Transp. Co.*, — U.S. —, 109 S.Ct. 493, 102 L.Ed.2d 529, *petition denied*, — U.S. —, 109 S.Ct. 885, 102 L.Ed.2d 1008 (1989), appellants have contended that the arbitral decision by the Board in appellants' favor here leaves appellants "without any remedy," because "no employee-contractual right has been violated" and "the adjustment board has no jurisdiction to enforce the [RLA]," so that "the board [is] powerless to rectify the actual injury suffered by the employees."

As stated earlier, the Board's determination concluded with an "Award" which merely stated that the questions posed to the Board were "disposed of as provided in the Findings and Conclusions herein." Appellants' remedy for any perceived inadequacy in the Board's determination, however, is provided by RLA § 3 First (q), 45 U.S.C. § 153 First (q) (1982), which establishes a judicial remedy for "any employee or group of employees ... aggrieved by the failure of any [adjustment board] to include certain terms in [its] award." *Id.* The reviewing court "shall have jurisdiction to affirm the order ... or to set it aside, in whole or in part, or it may remand the proceeding ... for such further action as it may direct." *Id.* We note in this connection the statement in *Chicago & N.W. Transp.*, in declining to enjoin the line sale there under consideration, that:

> If the NRAB rejects [the carrier's] interpretation of the collective bargaining agreements and determines that the employees who are displaced by the challenged rail line sale are entitled to relief, it will be able to order the necessary payment of monies and adjustments in seniority levels it deems necessary to

make these employees whole. Thus, it cannot be inferred that the legal remedy available to the RLEA unions in this case (via the NRAB arbitration procedure) is inadequate.

855 F.2d at 1288.

By noting the possible applicability of this statement to the situation resulting from the Board's arbitral decision in favor of appellants here, of course, we are not to be understood as prejudging, or providing a rule of decision for, any of the issues that may arise in the currently pending, or any subsequent, litigation concerning that decision.

### Conclusion

The order of the district court is affirmed. The post-argument motion to vacate and remand is denied.